Whitaker, Judge,
delivered the opinion of the court;
On March 5, 1954, plaintiff filed its petition in this case seeking damages for breach of its contracts with defendant, represented by the Production and Marketing Administration (hereinafter referred to as PMA) of the Department of Agriculture (hereinafter referred to as USDA), for the sale of 118' lots, or some 58,000 cases of eggs, which defendant intended to use in connection with its school lunch program. In Count I plaintiff says some of the inspectors who graded its eggs were “prejudiced, biased, and lacking in impartiality,” that they refused to inspect eggs tendered for delivery until they had been reworked, refused to reinspect them when requested to do so, used an improper candler in inspecting them, and otherwise acted in an arbitrary, capricious, and grossly erroneous manner.
Damages of $300,000 are alleged.
Its petition also contained Counts II, III, and IV, but our Commissioner has found, and plaintiff admitted, on oral argument that it had not made out a case on these counts.
Something over 18 months later, and about six months after the taking of proof had begun, plaintiff amended its petition by the addition of Count Y. In this count it alleged that the Department of Agriculture “unreasonably, arbi *360 trarily, capriciously, fraudulently, and in bad faith.”, (1) failed to make an impartial investigation of its complaints of improper grading, but, instead, sought to find evidence of wrongful conduct on the part of plaintiff and its president; (2) it sought to intimidate and coerce plaintiff into foregoing its claim against an egg dealer by the name of Weinberg Bros.; (3) it failed to furnish an adequate number of graders; and (4) it “intimidated, harassed, interfered with and coerced” certain egg graders who were doing an honest job in grading plaintiff’s eggs, and supplanted them with other graders who “arbitrarily, capriciously, fraudulently, unreasonably and improperly” graded plaintiff’s eggs.
It further alleged that the Department on May 3, 1955, repudiated its contracts for furnishing grading service and refused to furnish further service except on terms which discriminated against plaintiff in comparison with the service furnished other dealers similarly situated.
All of this it alleges resulted in damage to plaintiff’s business in the amount of $750,000.
A great deal of bad feeling has existed between the parties from the time of the first rejection of the eggs plaintiff tendered for inspection preliminary to delivery under the contracts. Plaintiff heatedly protested their rej ection, charging that two of the inspectors had not acted fairly and impartially. It was not long before it charged them with conscious wrong-doing, and demanded that they be withdrawn from plaintiff’s plant. Later, similar charges were made against other inspectors, and finally plaintiff alleged that the officials of the Production and Marketing Administration of the Department of Agriculture were in a conspiracy to put it out of business.
Plaintiff says one of the accused inspectors who was grading its eggs asked plaintiff’s president, Mr. Nichols, if he would sell him eggs on credit, if he should decide to go into the retail egg business, and this is not denied. Plaintiff also says that when he told Dolson, the supervisor of the Chicago area, comprising 12 States, including Illinois, that he was going to file a claim against the defendant, they got into a heated argument, in the course of which Dolson said that Nichols was trying to pick the inspectors to inspect his *361 products!, that he did not propose to let him do it, that he was not going to let him run the Department of Agriculture, but that the Department was going to tell him what to do, and that he had better do it and if he did not, he, Dolson, would put him out of business. This is not denied. The heat had not died down when the case was tried. During the trial plaintiff, or its attorney, charged one of the inspectors who testified with perjury.
In such an atmosphere, it is not easy to determine the true facts, but this we must do if we can, for, if the charges plaintiff makes are true, we have a case of outrageous official oppression, and positive dishonesty and fraud on the part of Government officers. If they are not true, plaintiff is to be severely condemned for making unsupported charges against Government officials and employees who were doing their duty.
We shall discuss Count I first. Plaintiff entered into two contracts with defendant, in its own name, to furnish storage eggs for use under the school lunch program. In addition, Rich & Company, brokers, entered into three other similar contracts on plaintiff’s behalf. The terms of the contracts were exacting, and hard to comply with by the furnishing of storage eggs, which were specified by the contracts. For instance, the contracts allowed a loss factor on account of “dirties, leakers and loss combined” of only %0 of one percent. This is only four or five eggs out of 1,500.
It was, of course, impossible to inspect every egg out of 21,000,000+, the number plaintiff was to furnish. The minimum number required to be inspected was 1,500 out of each lot of 180,000 eggs. The cases to be inspected were supposed to be selected at random by the inspectors. If the warehouse employees did the selecting of the sample, the inspector’s certificate was supposed to note this fact.
When the first lots were offered for the September 2 delivery at Peoria, Illinois, only 11 lots out of 47 were accepted. The inspectors for the Department of Agriculture were Thomas S. McCurley, who was the Supervisor for the State of Illinois, and Robert L. Young. Plaintiff requested that the eggs be reinspected. McCurley told plaintiff that it was useless to do so until they had been reworked, and he declined *362 to do so until this had been done.[1] He stated, either on this occasion, or at an earlier time, that in his opinion it was not possible for storage eggs to meet the rigid requirements of the specifications until they had been reworked. Three other officials of the USDA testified to the same opinion. This is supported by the fact that 40 of the 59 lots plaintiff placed in the warehouse in the spring, for which certificates of inspection were introduced in evidence, showed “dirties, leakers and loss” in excess of %o of one percent. Their condition did not improve with age. It was not unreasonable under the circumstances for the inspectors to require that they be reworked before they were reinspected.
The regulations permitted a dealer who was dissatisfied with the grading given to call for a regrading, or an appeal grading. Eegrading consists of a reexamination of the original sample and the examination of another sample selected at random. The revised grade is the average of the two. Eegrading is done by the inspector who did the first grading. An appeal grading is done by a different grader, two, if practical. The procedure is the same as in regrading. See Finding 19.
No appeal grading was requested.
Plaintiff reworked the eggs, as the inspector had insisted it should do. After having done so to the extent it considered necessary, it again offered them for delivery. Only 7 lots out of the 24 offered were accepted. This was due, in part at least, to the fact that, since there were no satisfactory facilities at the Peoria warehouse for reworking them, they were transported from the warehouse to plaintiff’s plants at Avon and Bushnell, some 55 miles away, for reworking, and then brought back to the warehouse for inspection and delivery. Handling of storage eggs tends to make them deteriorate. In addition, upon return to the warehouse they were left on the loading docks for several hours in temperatures ranging from 52.7° to 83°.
Later, arrangements were made, with the assistance of a Mr. Shearer, one of the PMA officials from Chicago, to *363 rework the eggs at the warehouse. After this had been done, 52 out of the nest 82 lots offered were accepted.
A total of 165 lots were offered at Peoria before the 77 lots to be delivered there were accepted.
All contracts were fully performed on November 12,1952. Since deliveries were due on September 2, 1952, and October 1, 1952, penalties were incurred for late delivery.
Plaintiff only complains of the regrading of its eggs which was done at Peoria. There were rejections at other places, but plaintiff does not complain about these. It says Inspectors McCurley and Young, who did most of the grading at Peoria, intentionally, arbitrarily, and fraudulently rejected eggs that complied with the specifications. If they did, plaintiff was damaged by the unnecessary cost of reworking them and penalties assessed for late delivery.
What proof does plaintiff offer to support this grave charge? Principally two things: one, that the percentage of rejections at other places was much less than at Peoria, and, second, some statistical studies it made of the grading of eggs put in warehouses in Chicago in the spring of the years 1949, 1950, 1951, and 1952, and the grading of them when they were taken out in the fall, which showed they graded higher in the fall than in the spring.
As to the latter, it is not shown that the eggs in question were plaintiff’s eggs, nor that McCurley and Young had any direct connection with the grading of them, except only that McCurley was the Supervisor for the State of Illinois. It is not shown that Young had any connection with the grading of them. Nor is it shown which of the two gradings were false, the spring gradings or the fall gradings. Also, the period covered is prior to plaintiff’s contracts. This testimony is of no value on the question of whether McCurley and Young were guilty of fraud in grading plaintiff’s eggs.
It is quite true that plaintiff fared much better with its deliveries at Memphis, St. Louis, and Burlington than it did at Peoria. At Memphis there were no rejections. At St. Louis, one out of five lots was rejected. At Burlington, of the seven lots offered for the September 2 delivery, only one was rejected; but three of the eight offered for the October 1 delivery were rejected, a total of four out of fifteen. *364 The Memphis eggs were shipped, nine lots from Peoria, and three from Burlington.
This indicates, but does not prove, either that the inspectors at Peoria were, at least, too strict, or the other inspectors were too lenient, or, perhaps, the quality of the eggs offered was not the same, or the inspectors at one place happened upon better samples than at another. Also, the findings show that grading is often a matter of judgment; two impartial graders might well differ in grading the same case. This is especially true here where only five eggs out of 1,500 could cause the rejection of an entire lot. The variance indicates, however, that something was wrong somewhere. It raises a question in our minds, but a question, a suspicion even, falls far short of that clear and convincing proof necessary to prove fraud.
When plaintiff reworked the eggs, it was necessary to examine them, reject the “checks” and “dirties, leakers and loss” and candle so many of the others as it deemed necessary. Its employees who did this work were in an excellent position to testify whether or not the rejections by the inspectors had been improper, but plaintiff did not call them to testify. We regard this as quite significant.
The regulations provided for an appeal from gradings which the egg dealer thought were improper. Where such an appeal was taken, the Department was required to have a different grader reexamine the samples inspected and examine other samples selected at random from the eggs offered. Such an appeal would have provided direct evidence of fraud, if fraud had been practiced. No appeal was taken. Instead of taking an appeal, plaintiff asked that McCurley and Young be replaced by other inspectors, but this it had no right to do, until it was shown they were acting improperly. An appeal should have disclosed whether or not they were acting improperly, but no appeal was taken.
Although plaintiff did not take an appeal, nevertheless Dale H. Shearer was sent down from the Chicago headquarters to investigate plaintiff’s complaints. He rechecked a number of the lots and found the samples substantially the same as the inspectors had graded them. Also, he checked two lots that had been reworked and accepted one and re *365 jected the other. No accusations are made against Mr. Shearer’s integrity or impartiality.
Besides McCurley and Young, a Mr. Crosson and a Mr. Dingham also inspected some of the lots offered. Of the 17 lots inspected by Mr. Dingham, 14 were rejected. No accusation is made against him.
In order to show partiality, plaintiff complains of the use of a BB candler, instead of the normal Faris candler. If a reflector is used with it, a BB candler is capable of giving a much brighter light than the Faris candler.
For two reasons this would seem to be no ground for complaint. First, any candler that is used must be one that will disclose defects within the interior of an egg. Its light must be bright enough for this. A brighter light does not disclose more defects — any candler is supposed to disclose them all; the brighter light merely makes them more readily apparent and, therefore, speeds up the work.
In the second place, this BB candler is in general use today. If plaintiff may complain of its use, hundreds of others may. We have heard of no others. It is also significant that the BB candler was used at Memphis, where there were no rejections. If it caused rejections at Peoria, it would seem it would have caused them at Memphis.
When we weigh the evidence pro and con, we must conclude that fraud in the grading of plaintiff’s eggs has not been proven. In spite of McCurley’s inquiry of Nichols about sales of eggs to him on credit, and Dolson’s remark that plaintiff had better do what the Department directed him to do or they would put him out of business — in spite of this, we think that the most that can be said is that the inspectors required strict compliance with the contracts. We are not convinced that the inspectors required more than their duty demanded. Out of 86 lots rejected, 83 were rejected because the “dirties, leakers and loss” exceeded %0 of one percent. Since most of the initial offerings were of eggs that had not been reworked, and since the certificates issued when the eggs were put in the warehouse in the spring showed “dirties, leakers and loss” in excess of %0 of one percent, in the case of 40 lots out of 59, it is not surprising that later that fall 83 out of the 165 offered should *366 have shown “dirties, leakers and loss” in excess of 3/10 of one percent.
Count I of plaintiff’s petition will be dismissed.

Go wit V.

Plaintiff claims in this count that officials of the United States Department of Agriculture, in reprisal for its making a claim against defendant for breach of its contracts to furnish eggs under the school lunch program, discussed under Count I, set about to destroy its business. It alleges it undertook to do this by failing to furnish the grading service it had contracted to furnish, and by arbitrary, capricious and fraudulent gradings by some of its inspectors, and by harassing, intimidating and coercing others.
On various dates prior to April 1, 1954, plaintiff and defendant entered into contracts for the grading of plaintiff’s products. These were supplanted by four contracts entered into on April 1, 1954. These contracts were on printed forms and were substantially the same. All of them read, in part, substantially as follows:
It Is Ageeed That:
(a) PMA will provide an adequate number of graders to perform the grading service covered hereby;
(b) At the sole discretion of PMA the graders may be either a Federal or State employee or a licensed employee of the applicant;
(c) PMA shall not be responsible for damages accruing through any acts of commission or omission on the part of any grader;
(d) The provisions hereof shall continue in full force and effect from its effective date until suspended, withdrawn, or terminated, by (i) mutual consent of the applicant and PMA; (ii) written notice given by either party to the other to take effect on a specific date not less than 30 days from the date of the giving of such notice; (iii) one (1) day’s written notice by PMA to the applicant, if the applicant fails to honor any invoice within thirty (30) days after date of invoice covering the cost of the grading service as herein provided; or (iv) termination of the services requested herein pursuant to the provisions in the following paragraph (e);
(e) The services to be rendered hereunder shall be terminated by PMA at any time PMA, acting pursuant *367 to any applicable laws, rules, or regulations, debars the applicant from receiving any further benefits of the service, or the services hereunder may be suspended or terminated at any time PMA concludes that the applicant has not conformed, or cannot conform hereto; * *
Coincident with the execution of the four contracts on April 1,1954, the following memorandum of agreement was also executed by the parties:
In order to have a mutual agreement as to the conditions under which service is being furnished, we request your concurrence to the following items:
1. Mr. Schute will be the grader in charge and inspector of egg products in charge for all contracts in effect in your plants at Avon and Bushnell, Ill.
2. A bonded assistant will assist Mr. Schute at Bushnell.
3. Mr. Schute’s headquarters will be Bushnell.
4. Mr. Schute’s normal hours of duty will be from 7 a.m. to 12 noon and from 1 p.m. to 4 p.m. Monday thru Friday. We do not expect hum to work overtime except on official work. His annual and sick leave will be in accordance with the cooperative agreement between the U.S. Department of Agriculture and the Ill. State Department of Agri.
5. All official travel of Mr. Schute is by direction of his supervisor. It is understood that he may travel between Bushnell and Avon as directed by you. Such travel will be charged to you at the regular Federal rate and is payable to the Treasurer of the United States upon presentation of a proper billing by the Grading Service.
6. You are to furnish both graders adequate facilities. These are (but not necessarily limited to) :
a. metal locker with lock.
b. individual egg scale with test weight.
c. scale for weighing 15 dozen eggs.
d. B. & B. candlinglight — this is the only light to be used in making official gradings.
e. thermometer for taking indiviual egg temperatures.
f. a satisfactory darkened inspection room to grade shell eggs.
7. Mr. Schute may only take technical direction from his Departmental supervisors. If you question his decisions, gradings, or inspection,. you may appeal these in accordance with the regulations of the Secretary of Agriculture part 55 and part 70, copies of which you *368 have. Such appeals may be directed to Mr. McCurley, Mr. Dolson, or the Washington Office of the Grading Service.
8. In accordance with your request, Mr. Schute will make routine comments to the person in charge of the work assignment, however, major comments will be made to you or your Son.
9. When you begin grading at Avon, Mr. Schute will review the work of each candler with the thought of selecting a bonded assistant for that plant should the volume handled be such that you desire a bonded assistant for that plant.
Prior to the school lunch contracts, the PMA, on May 21, 1952, issued Instruction 918 (PY)-4, which was sent to all dealers holding contracts for inspection and grading services. It read:
EMPLOYMENT OF RESIDENT GRADERS WITH STATUS OF CIVIL SERVANTS
I. Purpose
This instruction is issued as a guide in carrying out established policies in the rendering of grading service with respect to poultry, eggs, and egg products through use of civil servant licenses on Federal or State payroll.
II. Procedure
A. At least one grader, who has the status of a civil servant (State or Federal) will be Stationed in any one plant for each operating shift, regardless of the number of types of grading service requested, except that additional personnel may be stationed at a plant when the regional supervisor deems it necessary to properly carry out the departments’ responsibility. Alternative or assistant graders may be provided by licensing bonded employees. Final check gradings shall be made by the civil servant grader, and all certificates issued will be signed by him. Plowever, bonded graders may perform final check grading, and issue and sign certificates in cases of emergency leave or sickness on the part of the civil servant employee.
B. The foregoing procedure will be followed as expeditiously as possible with due consideration to operating and administrative problems in connection with the recruitment and training of such individuals. As rapidly as such civil servant personnel becomes available, they shall replace bonded graders. Action should be taken immediately to effect this procedure in all cases *369 where consumer grade labeling is being performed, and in plants where both inspection and grading services are in effect. In cases where product is identified only on the basis of institutional packs and where the services of sanitarians are required, the bonded grader and sanitarian shall be replaced as rapidly as possible.
C. Eecognizing the personnel management problem where seasonal operations or small volume are involved, or where product is identified only on the basis of institutional packs, other than in eviscerating and drying plants, the continued employment of bonded graders will be considered on an individual plant basis. Prior to considering the continued use of bonded employees in seasonal or small plants, consideration shall be given to rendering service by a circuit grader or sanitarian.
D. Presently employed licensed bonded graders are an excellent source of supply for civil servant graders. Graders secured from this source should be transferred to plants other than those where they are presently employed. _ However, with approval of the Chief of the Inspection and Grading Division, a civil servant grader may be stationed in the same plant where he has been employed under bond, provided his services as a bonded licensee have proven excellent in all respects.
On July 18, 1952, this was followed by another memorandum, enclosing a copy of Instruction 918, which explained its purpose. It was explained that reasons for establishing this policy included (1) some objections on the part of the industry that licensed bonded company employees could not perform as unbiased a job as civil service employees; (2) complaints had been received from livestock sanitation officials, Public Health officials, and Food and Drug Administration officials who urged that the term “Government graded” by licensed graders other than Federal or State employees be discontinued; and (3) it would be in the public interest to proceed toward the elimination of the use of bonded graders on as practical a basis as possible as soon as feasible.
The question before us is whether defendant breached its contracts by failing to furnish sufficient graders, and by failing to give fair and impartial grading service. In considering the facts plaintiff advances in support of its charges, we should bear in mind the colloquy between Nichols and *370 Dolson, after the school lunch program contracts had been fully performed, which we related in discussing Count I. Shortly after all deliveries had been made under that program, Mr. McCurley, the Supervisor for Illinois, and Dolson, the Supervisor for the Chicago area, comprising 12 States, including Illinois, came to one of plaintiff’s plants where they had a discussion with Mr. Nichols and Mr. Altheide, the Manager, about plaintiff’s complaints of unfair grading. The discussion became quite heated, Mr. Nichols complaining of unfair grading, and stating that he was going to file a claim against the Government, and Mr. Dolson replying that Nichols was trying to pick his own inspectors, and that he was not going to let him run the Department, but the Department was going to tell him what to do and he had better do it or he was going to put him out of business. However, Nichols says, after lunch, when Dolson came back to the plant, tempers had cooled, and he acted very much like a gentleman.
How does plaintiff support its charge of unfair and fraudulent conduct, on the part of defendant’s graders and their superiors, and its charge of a failure to furnish sufficient graders?
Plaintiff had two plants, one at Avon and the other at Bushnell, both in Illinois. Mrs. Anna Chambers had been plaintiff’s employee for 20 years and was supervisor of the egg room at the Bushnell plant. She had been licensed by the PMA to grade her employer’s product, and was bonded to faithfully discharge her duties. She served in this dual capacity from January 1952 to May 1955. Mrs. Zenna Bichter was also plaintiff’s employee and a licensed bonded grader at the Avon plant from January 1952 to January 1953.
On May 10,1952, one Harry J. Brown, a Government employed NACC[2] grader, was assigned to the Avon plant and remained there until June 12,1953. He also graded eggs at the Bushnell plant. He was succeeded by Julius Antoine, who served from July 7, 1953, to November 20, 1953. Eay Schute served during April and May 1954, Vitold Kilian *371 from June 1, 1954, until April 18, 1955, when he was succeeded by John W. Schoonover.
Notwithstanding Dolson’s threat to put plaintiff out of business in the latter part of 1952, plaintiff does not assert that any of the foregoing inspectors failed to render fair and impartial service. It concentrates its fire on John W. Schoonover, who arrived on April 15, 1955. If Dolson meant to carry out his threat to put plaintiff out of business through unfair grading of its products, as plaintiff alleges, it would seem he would not have waited until April 15,1955, to set about doing so.
Plaintiff alleges that Mr. Kilian was replaced by Schoon-over pursuant to the design of the officials of the PMA to wreck plaintiff’s business, but plaintiff has completely failed to prove such a design. It reiterates over and over that there was such a design, but evidence to support the charge is lacking.
Kilian was transferred to another post on the order of Ward Wagner, the Assistant Chief of the Inspection and Grading Division in Washington. While on a trip to review egg processing operations in Illinois, Indiana, and Missouri he called at plaintiff’s plant, accompanied by McCurley, the Supervisor for Illinois. While there he saw half of a lot of eggs stacked on dollies outside the cooler, which had been marked for delivery on an Army contract. He took the temperature of the eggs and found that it was from 66° to 70°. The Army contract required that the eggs be kept at a temperature under 50°. Kilian had recorded the temperature at 46° to 49°, but he took this temperature prior to their being loaded on the delivery trucks, contrary to the Army contract. This was said to be the reason for transferring Kilian. There was a lot of controversy about which temperature reading was correct; but, so far as we are concerned, it makes no difference. It proves nothing in support of the charge of a design to wreck plaintiff’s business. Anyway, it was Wagner who transferred Kilian, not Dolson. Wagner did not order Schoonover to replace him. This was done by Dolson. There is no proof that Wagner and Dolson conspired to wreck plaintiff’s business.
*372 Plaintiff says that Schoonover fraudulently rejected eggs that should have been accepted, but the proof does not sustain this. Upon arrival, Schoonover and Kilian j ointly inspected two lots, both of which were rejected. Plaintiff does not show that they should have been accepted. Plaintiff believed in Kilian and complains that he was not permitted to remain as the inspector at its plants. If Schoonover practiced a fraud in rejecting these two lots, Kilian was also guilty of fraud. Schoonover also participated in the inspection of seven other lots, two of which he inspected by himself. These were re j ected. There is no proof that they should have been accepted. Plaintiff took an appeal from Schoonover’s gradings on one lot. Since this lot was destined for the Army, the appeal was decided by the Army Veterinary Corps, not by the USDA. A Colonel Gould and Captain Bland reinspected the eggs. They sustained Schoonover. Plaintiff never appealed any other gradings by Schoonover.
Plaintiff complains that Schoonover would not pull out the cases of eggs, but required its employees to do so. This hardly shows fraudulent conduct. Schoonover explains that this was necessary because the eggs were packed so closely that none of the cases, except those on the front of the stacks, could be inspected without moving a number of them. Careful inspection required that samples be selected from various parts of the lots. This could not be done without moving many of them.
It seems to us this is a trivial complaint.
Our Commissioner found that Schoonover asked Altheide, the plant manager, if he could bring his tape recorder to the plant and listen to the music. Mr. Nichols so testified, but Schoonover denied it. We have made no finding on it, because, whether he did or did not, it has no probative value. We relate it only because this incident and the repossession from Mrs. Anna Chambers of the stamp used in certifying eggs was the immediate occasion for Mr. Nichols’ order to Schoonover to get out of his plant and to stay out. Schoon-over got out, but returned the next day, but Altheide, the plant manager, told him he would not be permitted to make any more inspections. Accordingly, on the instructions of *373 Mr. Dolson, Schoonover picked up all Government property-used in grading eggs and left, on May 3, 1955.
All of the foregoing relates primarily to the Avon plant. As stated, Mrs. Anna Chambers, plaintiff’s employee, had been licensed by the PMA to inspect and grade plaintiff’s eggs. She did so without interruption until January 1953. After that date she was permitted to inspect eggs, but the certificate showing their grade had to be signed by the NACC grader. Nichols requested that Brown, the NACC grader at Avon, be transferred to Bushnell, but McCurley, the State Supervisor, declined to do so. Instead, he offered to employ Mrs. Chambers as a PMA grader, but this was not done. Later, she was authorized to resume grading service at the Bushnell plant and to issue a certificate reading:
ABOVE EGGS PACKED IN ACCORDANCE WITH OFFICIAL GRADING UNDER CONTINUOUS SUPERVISION, AND ARE COVERED BY WORK SHEETS ON FILE.
It was, of course, within the discretion of the USDA to permit or to forbid a grader other than a Government or State employee to issue a certificate. The policy set out in Instruction 918, quoted supra, was to dispense with all graders other than civil servants as rapidly as possible, and to require bonded graders to work under the supervision of a NACC grader. Plaintiff cannot complain of the restriction imposed on Mrs. Chambers’ activities and of the requirement that certificates be signed by a NACC employee. Apparently there was no difficulty in getting them signed by the inspector at Avon or by some other inspector, because Mrs. Chambers says the suspension of her right to issue certificates did not interrupt plaintiff’s business.
There was an interval, the duration of which is not shown, when there was no grader at the Bushnell plant, but plaintiff makes no claim for damages based alone on this alleged breach nor offers any evidence from which any estimate of the damages sustained, if any, can be made.
In order to show discrimination against it, plaintiff presented a comparison of the number of bonded and NACC graders within the area in which plaintiff did business, for the years 1951 to 1956. This showed a decrease in the number *374 of bonded graders and an increase in NACC graders, the greatest difference occurring in Iowa, and the lesser in Illinois. See Finding 47. This decrease in bonded graders and increase in NACC graders was in line with the policy set out in Instruction 918, quoted supra. This was first published prior to plaintiff’s controversy with the USDA and was of application throughout the United States. We do not think this is evidence of discrimination against plaintiff. If the supplanting of bonded graders with NACC graders is evidence of discrimination, it is the dealers in Iowa who have reason to complain.
Plaintiff makes a good deal of the so-called Weinberg incident. In the latter part of 1952, plaintiff sold two lots of eggs to Weinberg Bros, of Chicago, to be shipped to the Cantu Fruit Company of Laredo, Texas. Harry J. Brown, an NACC inspector at plaintiff’s Avon plant, inspected the eggs, and graded one lot as 79.74 percent B quality, and “loss” 1.87 percent, and the other as 78.2 percent B quality, and “loss” 2.2 percent. When they arrived at Laredo they were graded by one Schrimsher, another NACC inspector, both lots as, “no grade”, and the “loss” on one lot as 62.4 percent, and, on the other, as 17.7 percent. (Any lot containing more than 5 percent loss was graded “no grade.” The highest grade was United States Grade AA, the next, U.S. Specials, the next, U.S. Grade A, then, in order, Procurement I, Procurement II, Procurement III, Procurement IV, U.S. Extras, U.S. Grade B, U.S. Standards, U.S. Grade C, US. Stained, U.S. Trades, U.S. Dirties, and U.S. Checks. When eggs did not meet the standards of any of these grades, they were rated “no grade”.)
The consignee at Laredo refused to accept the eggs and returned them to Weinberg Bros, in Chicago. Weinberg asked Dolson, whose office was also in Chicago, to send over an inspector to inspect them. For some reason Dolson himself came over and Weinberg says he pronounced the eggs, “rotten”. Weinberg refused to pay for them. Nichols said he told him he had the USDA officials behind him. One would suppose that he was referring to Schrimsher’s certificate and Dolson’s statement that the eggs were rotten, but *375 Nichols says it shows the PMA was trying to put him out of business. We do not draw snch an inference.
Nichols brought suit. Schrimsher’s deposition was taken, presumably by Weinberg, but, when presented to him for signature, he refused to sign it, upon advice of his superiors, because a copy of it was not furnished him. Whether he was justified in doing so, we do not know, but how this prejudiced plaintiff, we are unable to see, nor can we see how it shows discrimination against it by PMA. Schrimsher was Weinberg’s witness, no doubt, and his testimony must have been unfavorable to Nichols. If it was never put in evidence, so much the better for Nichols.
In a note to his finding 86, the Trial Commissioner says Schrimsher was recommended for his job at Laredo, Texas, by one Frank J. Santo at Des Moines, and he quotes a letter written Santo by Schrimsher’s supervisor at Dallas, Texas, in which he says Schrimsher “did a wonderful job in his testimony.” We have omitted this from our findings, because we cannot see how it can possibly have any probative value.
As a result of this incident, Harry J. Brown was investigated, and plaintiff says this shows discrimination against it. Brown admitted he had been negligent, that he had not locked up his grading stamps, as required, but had left them in his car, and that the cases delivered to Laredo, Texas, were not the same cases he had stamped in Avon. He also admitted to having signed work sheets of some other person as having been his own. Formal charges were preferred against him. He did not demand a hearing, but resigned.
Thereafter, he was employed by plaintiff.
Plaintiff has failed to prove that any official or any group of officials of the Department of Agriculture set out to wreck its business. It has failed to prove that any of them were arbitrary or capricious in their dealings with it, or in their conduct toward it; nor has it proved that any inspector was guilty of fraud in the grading of its eggs or did so improperly.
Finally, we come to the question of the cancellation of plaintiff’s grading contracts.
On May 2, 1955, plaintiff wrote its associated dealers, for whom it was acting as their marketing agent, stating that it *376 intended to dispose of its plants as soon as possible, and it suggested that they find other marketing outlets.
At about the same time, plaintiff wired the Deputy Chief of Dairy and Poultry Inspection Service of PMA in Washington demanding the replacement of Schoonover and stating that unless this was done and immediate cooperation was received, it would be necessary to cease operations. Two additional graders were requested by April 25. On April 25, L. W. Fletcher of the Washington office wired plaintiff that two additional graders could be furnished at $4 per hour and expenses. The following day, Mr. Hamann, Chief of the Inspection and Grading Division of PMA at Washington, wired plaintiff that it considered Schoonover’s services satisfactory, but it would assign two additional inspectors to plaintiff’s plant, if desired. The telegram concluded: «* * * jf y0U wish to apply for cancellation without consideration to the 30 day clause we will consider your application on this basis.”
In reply, plaintiff wrote Mr. Hamann a long letter, the thirteenth paragraph of which reads:
13. We are left no alternative from your telegram but to accept the present grader Mr. Schoonover or request cancellation; It is impossible for us to accept the present grader under the circumstances either physically, financially, or mentally and altho we would like to receive the service on the proper basis and do not wish same must request immediate cancellation unless given reconsideration by yourself or a superior. This is of course with waiver of the 30 day clause as the extra charges and loss now incurred are more than we can absorb.
In conclusion plaintiff’s president, Nichols, said: “I am tired and feel that fighting government bureaucracy is an unsur-mountable obstacle. Unless you reconsider and give us the cooperation and service we need and desire please cancel the service as soon as possible.”
On April 29, apparently before receipt of plaintiff’s letter of the 27th, Hamann wired plaintiff:
Reference your wire to Herman Miller April 22,1955 your letter handled [sic] to L. Fletcher April 25, 1955 and our wire to you April 26,1955. Please clarify your statements requesting waiver of service and discontinue *377 our present business do you desire to cancel your contracts for grading service and request that we waive the 30 day cancellation clause please advise immediately.
In reply, on the same day, plaintiff wired Hamann, in part, as follows:
* * * meantime our dealers met and are desirous continuing business if possible please read our letter 27th and advise accordingly suggest you give serious consideration to reconsidering entire situation before making a decision and consider replacing present inspector with one from some country point that has had no contact personally or otherwise with Dolson or Chicago situations and one who is in a position to give fair and impartial gradings * * *.
After receipt of plaintiff’s letter of April 27, Hamann wired plaintiff on May 3,1955, as follows:
As requested in your letter of April 27,1955 and because of actions taken by you and Mr. Altheide on May 2 and 3 in barring Schoonover from your plant all contracts for grading services with the Agricultural Marketing service to be furnished at Avon and Bushnell are hereby cancelled, effective close of business May 3,1955 the acceptance of your notice of cancellation of contracts does not affect your privilege of requesting non-contract grading under the regulations.
Plaintiff protested the cancellation of its contracts. Hamann replied as follows:
Eeurtel May 4 my wire to you April 26 advised we did not consider Schoonover as having been negligent his performance of duties since you asked him to leave plant afternoon of May 2 and Altheide advised him May 3 that his services not wanted cancellation of your contracts effected in compliance request contained in item 13 page 6 your letter April 27.
Plaintiff began negotiations for the reinstatement of its contracts. Defendant declined to reinstate them, but on June 15, 1955, offered plaintiff a new contract on the same terms and conditions as the old ones, but with the understanding that Mrs. Chambers would be licensed, but that there would be a final inspection by an authorized Federal or State employee, who alone was authorized to issue a *378 certificate. This proposed contract differed from the old ones only in that it incorporated in its terms the policy announced in Instruction 918, supra. Plaintiff declined to accept it, for the primary reason, apparently, according to plaintiff’s brief, that Mrs. Chambers was not to be permitted to issue certificates as a bonded grader, but that all certificates had to be issued by a PMA employee, which plaintiff said would put plaintiff under the complete control of Dolson and McCurley.
It would seem that what Nichols said at the conclusion of plaintiff’s letter of April 27, 1955, was true, to wit:
I am tired and feel that fighting government bureaucracy is an unsurmountable obstacle. Unless you reconsider and give us the cooperation and service we need and desire please cancel the service as soon as possible.
From the foregoing recitation of facts it appears that plaintiff had decided to go out of business, unless it could continue with the grading service it demanded. In its long letter of April 27 plaintiff set out its grievances, real or fanciful, stated the terms upon which it wished to continue, and stated that if this was denied it, it “must request immediate cancellation.” Defendant took it at its word, gladly, we suspect, certainly with alacrity, and cancelled the contracts. It was within its rights in doing so.
As stated, the new contract offered plaintiff was no more onerous than the prior ones, read in conjunction with Instruction 918, and required no more, as a condition of giving grading service, than was permitted by the law and regulations. It differed from the old only in that it specifically defined Mrs. Chambers’ status and that of other bonded graders, but that status did not differ from her status under the old contracts.
Plaintiff has not made out a case under Counts I and V. Its petition will be dismissed.
It is so ordered.
Daee, Senior District Judge, sitting by designation; Due-fee, Judge; and Laramore, Judge, concur.
Jones, Chief Judge, took no part in the consideration and decision of this case.
*379 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is and at all times herein pertinent was a corporation organized and existing under the laws of the State of Illinois, with its principal places of business at Avon, Illinois, and Bushnell, Illinois. The plaintiff, its predecessor company, and the Nichols family have been engaged in the poultry and wholesale egg business for many years, and during the years from 1947 to 1952 had sales of from $6,000,000 to $7,000,000 per annum. The plaintiff operated a fleet of trucks which picked up eggs from suppliers in Illinois, Iowa, and Missouri. The plaintiff was recognized as one of the largest wholesalers of eggs in the United States.
2. The Production and Marketing Administration (sometimes hereinafter referred to as PMA) of the United States Department of Agriculture (sometimes hereinafter referred to as USDA) provided inspection and grading services for egg and poultry dealers and processors whereby these commodities could be priced and traded under standardized classifications. These services were provided on a fee basis to dealers and processors having intermittent or irregular inspection requirements, and under continuing service contracts for larger dealers and processors requiring continuous service, on the basis of the cost of rendering such service. The classifications and grades under USDA standards were required on the commodity exchanges and were relied upon by the trade generally, so that it became necessary to obtain such grading service to successfully compete in the egg and poultry business.
Mr. William D. Termohlen was the Director of the PMA Poultry Branch and Hermon I. Miller was the Deputy Director. Mr. Henry G. H. Hamann was the Chief of the Inspection and Grading Division, Bernard W. Kempers was Chief of the Poultry Products Section, and Louis Ward Wagner, a marketing specialist, was Assistant Chief of the Poultry Products Section of the Inspection and Grading *380 Division. Roy D. Mato was the contracting officer under contracts herein involved for the delivery of eggs under the USDA school lunch program and was succeeded by Brian T. Cunningham, representing the Secretary of Agriculture.
Lawrence J. Dolson was the Supervisor of the Grading and Poultry Division for the Chicago area,, consisting of twelve States, including Illinois, and Dale H. Shearer was his assistant. T. S. McCurley was a Federal-State Supervisor in charge of the Springfield, Illinois office and the State of Illinois, for inspection and grading of eggs and poultry products.
3. Since, during the oral argument of this case, plaintiff conceded that it had failed to prove it sustained any damages under Counts II, III and IV, the court makes no findings of fact with respect to those counts.

Ooumtl

4. The Production and Marketing Administration, USDA, by Announcement PY-61, dated April 15, 1952, offered to purchase through competitive bids approximately 500,000 cases of Government-graded oil processed shell eggs, produced in the Continental United States and packed in new cases for use in connection with the school lunch program. The pertinent provisions of PY-61, as amended, are as follows:
The United States Department of Agriculture (hereinafter referred to as USDA) announces that it will purchase through competitive bids for future delivery, approximately 500,000 cases of Government-graded oil processed shell eggs produced in the Continental United States. Until further notice, but not later than June 24, 1952, offerings will be considered weekly covering shell eggs which at the time of delivery will grade at least 60% “A” quality, Large 45 pounds average net weight per case of 30 dozen eggs. (See Article II, Quality and Weight).
To be acceptable for delivery, the shell eggs in carlot quantities must be stored in PMA-approved warehouses located in the 22 cities listed below, or in warehouses approved by PMA for the storage of shell eggs located in cities immediately adjacent to or within the switching limits of these 22 cities. Furthermore, consideration *381 will be given to offerings in PMA-approved warehouses at any location in the United States, and acceptances will be made, providing it is to the advantage of the USDA. Prior to the time of final inspection and delivery to USDA, the shell eggs may be stored in any warehouse, whether or not approved by PMA. Shown below are the quantities proposed to be purchased in each city for delivery September 2, October 1, November 1, and December 1,1952. While the quantities specified have already been contracted for at some of the delivery points, nevertheless vendors may continue to make offerings at all points listed, or elsewhere, until June 24, 1952, and acceptances will be made, providing it is to the advantage of the USDA.
* * * * *
TERMS AND CONDITIONS
General: In submitting an offer to sell, the terms and conditions of the Announcement and those set forth in “Standard Contract Conditions”, Form PMA-100, except Articles la, 3b, 6, 8, 9, 10, and 16, thereof, shall become a part of the offer to sell, and upon acceptance by USDA the offer and acceptance shall constitute a valid and binding contract.
Article I, Quantity: Offers shall consist of one or more minimum carlot quantities of not less than 480 cases (30 doz.) and preferably 600 cases. Provided, however, that failure to offer lots of more than 480 cases will not be cause for rejection.
Article II, Quality and Weight : The quality of the shell eggs offered shall be in accordance with the UNITED STATES STANDARDS FOR QUALITY OF INDIVIDUAL SHELL EGGS, and shall average not less than 60 percent “A” Quality. Within the maximum of 40 percent which may be below “A” Quality, not more than 10 percent may be of the qualities below “B”. Said maximum tolerance of 10 percent may consist of “0” Quality, Stained, not more than 3 percent Checks, and not more than %0 percent Dirties, Leakers and Loss combined.
In instances where the percentages of Checks, Leakers and Smashed Eggs exceed the maximum tolerances indicated, USDA will, upon receipt of satisfactory evidence of damage to eggs while in transit to delivery point, accept delivery, as hereinafter noted, at a reduction in price to be determined by USDA. A grading and weight certificate obtained at point of origin within *382 15 days before the date of delivery showing the lot to be within the required maximum tolerances, will be accepted as evidence of condition prior to shipment to delivery point. In no event will the eggs be accepted if the number of Checks exceeds four and one-half (4%) percent or, if the number of Leakers, Dirties or Smashed Eggs combined exceeds seven-tenths (.1) percent. Such adjustment in price per dozen will be made by an amendment to the contract.
Individual cases within a carlot may contain less than 60 percent, but not less than 50 percent “A” Quality eggs, except that one case in each 10 examined may contain between 40 and 50 percent “A” Quality eggs. Individual cases may contain not more than 18 percent eggs below “B” Quality, provided the average percentage for the carlot is not more than 10 percent below “B” Quality.
Eggs offered as “Large” shall have an average net weight of not less than 45 pounds per case of 30 dozen, with no case weighing less than 44y2 pounds. The average weight for individual eggs shall be at the rate of 24 ounces per dozen, with not more than an average of 3.33 percent of the eggs in any lot weighing less than 23 ounces per dozen, and no individual case shall contain more than 10 percent of eggs weighing less than 23 ounces per dozen.
The commodity code for this grade and packing of oil processed shell eggs is: 0930052.
Not to exceed two (2) percent of the eggs may be packed small end up.
Hi ❖ H? Hs
ARTICLE IY, GRADING and Checkloading : The official grading and checkloading shall be performed at the point of delivery shown in the offer by licensed graders of the Production and Marketing Administration. (PMA) and it shall be incumbent upon the vendor to arrange with the Poultry Inspection and Grading Division, Poultry Branch, PMA, for grading and check-loading services. As used herein, checkloading means that the commodity will be checked for identification, count and weight prior to transfer of title to USDA. All costs, including grading and weighing fees and expenses of graders, as well as expenses of check-loading services shall be paid by the vendor. Each case of eggs must be stamped by the PMA grader on one end with an official identification, including the USDA Lot Number, except as provided in Article VI, Para. 2.
To be acceptable, egg grading and weight certificates must bear dates not more than 7 days prior to the con *383 tract delivery date. Upon the completion of grading and the marketing of containers, vendors shall forward immediately to the PMA Commodity Office one copy of such certificate.
Aeticle V, Pkices : The purchase prices are based, on shell eggs packed and marked as prescribed in Article VI hereof. If, upon delivery to USDA, it is determined that the commodity does not meet contract requirements as to grade or weight, USDA, will accept the eggs and make payment according to the following schedule:

When the grading certificate shows the grade to he: Reduction in Price:

Between 55% and 59.9% “A” quality_Two cents per dozen

When the grading certificate shows the average weight to he: Reduction in Price:

Between 44 lbs. and 44.9 lbs. net per case— One cent per dozen. Between 43 lbs. and 43.9 lbs. net per case— Two cents per dozen.
Shell eggs grading below 55 percent “A” quality or 43 pounds average net weight will be rejected.
$ * * $ $
Article VII, Delivery: The shell eggs shall not be deemed ready for delivery until they, are properly packed, until the Egg Grading and Weight Certificate has been issued by PMA and until they meet contract requirements in all respecta. USDA will issue an order for delivery at least 10 days prior to the delivery date specified in the contract. After receipt of such order for delivery, the vendor shall effect transfer of title of the shell eggs in the warehouse on the date of delivery specified in the contract, and furnish USDA with a nonnegotiable warehouse receipt properly executed as prescribed by USDA. Transfer of title shall not be made before or after the contract delivery date.
If vendor fails to make delivery in accordance with contract terms, such failure will be considered sufficient reason for USDA to proceed under the provisions of AETICLE 1 of Form PMA-100, and USDA reserves the right to purchase the commodity elsewhere and charge the vendor any excess costs resulting from vendor’s failure to deliver.
Contractor shall, at his expense., take all necessary steps to protect the product after inspection by PMA and until delivery to USDA. Such protection shall include storing of the shell eggs at a temperature of 29%° to 31° F.
The vendor will pay all in and out handling charges through the contract delivery date and for not less than 10 days subsequent thereto. USDA will not pay for *384 charges of any kind incurred by vendor prior to the date of transfer of title.
On delivery, a plus or minus tolerance of five (5) percent in quantity will be allowed; provided, however, that no carlot quantity is less than 480 cases or more than 600 cases.
5. The pertinent provisions of Form PMA-100, entitled “Standard Contract Conditions,” which was specifically incorporated in and made a part of PY-61, are as follows:
Article 2. Specifications. The Commodity shall meet the specifications prescribed by the Contract and shall conform to the applicable provisions of the Federal Food, Drug and Cosmetic Act, and amendments and regulations thereunder.
Article 3. INSPECTION, (a) The Commodity must be inspected after the date of the Contract and prior to delivery unless otherwise provided by the Contract. Such inspection shall be made by USDA, or by any person or agency designated by and under the supervision of USDA after the Contractor’s request therefor, (b) If the Contractor shall request inspection of the Commodity at least 10 days before the date of delivery or the first day of the delivery period as specified in the Contract, then the provisions of Article 7 hereof shall not apply to the delay, if any, occasioned by the failure to make inspection in sufficient time to permit delivery at Time for Delivery; otherwise the provisions of said Article shall apply to any such Late Delivery, (c) For the purposes of the Contract, inspection shall not be deemed to be complete or the Commodity deemed to be inspected or ready for delivery until the inspection certificate has been issued, (d) Unless otherwise provided in the Contract (1) the cost of inspection shall be borne by the Contractor, (2) the cost of samples furnished for inspection shall be borne by the Contractor, and (3) any chemical analysis required for such inspection shall be made in accordance with the Official and Tentative Methods of Analysis of the Association of Official Agricultural Chemists in effect on the date of the Contract, (e) Inspectors are not authorized and have no authority to prescribe any changes in the Contract or to order Contractor to perform under the Contract in any particular manner, (f) Inspectors are not authorized to accept or reject commodities offered for delivery.
*385 Article 7. Delay. If the Contractor refuses or fails to perform the Contract within the time specified, or any extension thereof, Agency may, by written notice, terminate the right of the Contractor to proceed with delivery or with such part or parts thereof as to which there has been delay, and may hold Contractor for any damage caused Agency by reason of such termination. Contractor’s right to proceed hereunder shall not be terminated if he gives Agency prompt written notice of such delay and the cause thereof and the Agency determines in writing that the delay is due solely to causes beyond the control and without the fault or negligence of the Contractor, including but not limited to, preference, priority or allocation orders issued by the Government. Written notice of such determination shall be given to the Contractor. In cases of such excusable delay, the time for performance shall be extended for a period equivalent to the time lost because of the delay but not exceeding 60 days, unless Agency by a written notice to the Contractor extends the period beyond 60 days. The decision of the Agency as to cause of delay shall be final and conclusive on the parties. If performance cannot be completed within the period as extended the Contract may be terminated by Agency, without prejudice to any rights of Agency due to Contractor’s breach.
*****
Article 12. Changes and Extras. No changes in the terms and conditions of the Contract shall be allowed unless the same have been ordered in writing by the Agency and a change in price, if any, has been stated in such order.
*****
Article 15. Assignment op Claims. No claims against Agency may be assigned except in accordance with the Assignment of Claims Act of 1940. Contractor is permitted to assign the proceeds of the Contract, or any claim arising from any “Tender of Delivery” where such “Tenders of Delivery” are specifically provided for in the Contract. (31 U.S.C. § 203).
* * * * *
Article 22. Disputes. Any dispute concerning questions of fact which may arise under the Contract and which is not disposed of by mutual agreement, shall be decided by the officer executing the Contract in behalf of the Agency or by a designee of the Agency who shall *386 reduce bis decision to writing and mail a copy to the Contractor. Within 30 days from said writing Contractor may appeal to the head of Agency j whose decision or that of his designated representative shall be final and conclusive upon the parties. Pending decision of such dispute the Contractor shall diligently proceed with the performance of the Contract.
6. The foregoing specifications called for storage eggs of an exceptionally high quality. Its requirements were rigorous; for instance, they permitted only 5 eggs out of 1,500 to be within the classification of “dirties, leakers and loss.”
7. The following “Memorandum to Contractors Under Announcement PY-61, Purchase of Shell Eggs” was issued August 12, 1952, by Hermon I. Miller, Acting Director, Poultry Branch, and reads as follows:
This has reference to Article IV, Grading and. CKech-loading, of Announcement PY-61, under which you have contracted to deliver oil-processed shell eggs. Among other provisions, this Article specifies that you shall furnish PMA Grading and Weight Certificates that bear dates not more than 7 days prior to the contract delivery date — September 2, October 1, November 1, or December 1, 1952, as the case may be. In view of the great volume of egg grading work placed on the Inspection and Grading Service just prior to these dates, and in order to give contractors ample time for candling, or for recandling operations, if necessary, it has been determined that certificates will be acceptable which are dated within 10 days prior to the respective contract delivery dates.
Vendors are reminded that all eggs must be stored at the delivery point named in their contracts in sufficient time to accomplish all grading or regrading operations, so that certificates can be issued within the 10-day period herein provided.
In case you have not arranged for PMA grading service, we suggest that you do so at once in order that we may schedule the service to meet your needs.
8. Pursuant to announcement PY-61, Nichols & Company submitted a bid on June 13, 1952, which was accepted by PMA June 19, 1952, as contract A1PM(MF)2727, for 30 *387 lots (15,000 cases of 30 dozen each) of eggs at an approved warehouse in Peoria, Illinois, of which 20 lots were specified for delivery on September 2,1952, at $.5250 a dozen and ten lots were specified for delivery October 1, 1952, at $.5320 a dozen.
All of the lots of eggs offered for delivery under contract AlPM(MF) 2727 on September 2d and a substantial portion of those offered for delivery October 1st failed to meet the quality requirements specified in PY-61 and were rejected. Upon requests of the plaintiff for extensions of time on deliveries, the PMA granted extensions, which were accepted by the plaintiff, for the September 2d to September 12th deliveries, at one-fifth of a cent a dozen a day, two-fifths of a cent for deliveries from September 13th to 17th, inclusive, and four-fifths of a cent a dozen a day from September 18th to 22d. A similar penalty of one-fifth of a cent a dozen a day was imposed for delays in deliveries due October 1 to 12, 1952. The plaintiff continued in default on some lots and was finally granted extensions for both delivery dates to November 7, 1952, at a flat two cents a dozen for all lots on which deliveries were late ten days or more.
9. On June 21, 1952, plaintiff submitted a bid, which was accepted by by PMA on June 26, 1952, for 24 lots (12,000 cases) of eggs at an approved warehouse in Burlington, Iowa, of which eight lots were specified for delivery September 2, 1952, at $.5249 a dozen, eight lots for delivery October 1, 1952, at $.5349 a dozen, and eight lots for delivery November 1, 1952, at $.5449 a dozen, all under contract designated as A1PM (MF) 2738.
Upon request of the plaintiff, the PMA granted an extension of ten days for deliveries due September 2d and October 1st, at a penalty of one-fifth of a cent a dozen a day, which was accepted by the plaintiff. One lot which was due for delivery September 2d was delayed seven days, two lots due for delivery October 1st were delayed two days, and one other lot eight days. There were no delays in the November 1st deliveries at Burlington, Iowa.
10. In addition to the 54 lots of eggs sold by the plaintiff *388 in its own name, the plaintiff also sold 64 lots of eggs through Sol Rich & Company, acting as plaintiff’s broker. During 1952, Sol Rich & Company was regularly engaged as a broker in connection with the sale of eggs and other commodities for others. At the request of the plaintiff, Sol Rich & Company, sometimes referred to as Rich, submitted bids in its own name pursuant to announcement PY-61 on behalf of the plaintiff and a number of other dealers throughout the country, in accordance with custom in the trade.
Plaintiff informed the defendant by wire on September 14, 1952, that its eggs were sold under Rich contracts AlPM (MF) Nos. 2691,2695, and 2732, and requested an extension of time without penalty for the undelivered lots that were past due at that time. The defendant was also informed by Rich on August 19,1952, that a portion of the eggs sold under contract 2695 were for the Nebraska Egg & Poultry Company. All other correspondence relating to these contracts was carried on with the defendant and Sol Rich & Company. The Rich contracts involving the 64 additional lots of plaintiff’s eggs are described in the following findings.
11. On May 10,1952, Rich submitted a bid for the delivery of eight lots of eggs pursuant to PY-61, with deliveries at Chicago, Los Angeles, San Francisco, Dallas, St. Louis, and Memphis. The contracting officer for PMA accepted only four lots, all of which represented plaintiff’s eggs, for delivery September 2,1952. By letter of May 15,1952, Rich was notified of this award under contract 2691. Two lots (1,000 cases) were designated for delivery at St. Louis, Missouri, at $.5224 a dozen, and two lots (1,000 cases) for delivery at Memphis at $.5274 a dozen.
By letter of May 22,1952, Rich notified plaintiff that these lots were sold for plaintiff’s account.
12. On May 17,1952, Rich submitted a bid for the delivery of 42 lots of eggs under PY-61 at various points throughout the country. On May 21,1952, this offer was accepted in full by the PMA as contract 2695. It included 20 lots (10,000 cases) of eggs owned by Nichols & Company, of which five lots were to be delivered at an approved warehouse in St. *389 Louis September 2,1952, at $.5224 a dozen, five lots for delivery in St. Louis October 1, 1952, at $.5324 a dozen, five lots for delivery in Memphis September 2,1952, at $.5274 a dozen, and five lots for delivery in Memphis October 1, 1952, at $.5'374 a dozen.
On May 22, 1952, Eich notified Nichols & Company that the 20 lots of eggs were sold for its account under PY-61 and also advised of the prices specified in contract 2695.
13. On June 14, 1952, Eich submitted a bid under PY-61 for the delivery of 46 lots of eggs, including 40 lots for delivery at Peoria, Illinois, two lots at Lincoln, two lots at York, Nebraska, and two lots at Duluth, Minnesota. This offer was accepted by PMA on June 19,1952, under contract 2732. The 40 lots (19,200 cases) of eggs specified for delivery at an approved warehouse in Peoria, Illinois, were sold for Nichols & Company, with 20 lots to be delivered September 2, 1952, at $.5224 a dozen and 20 lots to be delivered October 1,1952, at $.5324 a dozen.
By letter of June 20,1952, Eich notified Nichols that these eggs were sold for its account.
14. The plaintiff ascertained that the approved warehouse in St. Louis where it was contemplated that the September 2, 1952, deliveries under the Eich contracts 2691 and 2695 would be made, was filled with Government surplus commodities and that the warehouse could not accept the eggs for storage. On August 14, 1952, Eich requested a change of the delivery point for the seven lots (3,500 cases) of eggs for delivery September 2,1952, from St. Louis to Peoria, Illinois, with an allowance of freight to St. Louis. The contracts (2691 and 2695) were amended by the contracting officer, Eoy D. Flato, and Eich was notified of the amendment on August 22,1952, providing for a change in place of delivery of the September 2 shipment from St. Louis to Peoria, at a reduction of $.025 per dozen. The change in delivery point to Peoria with reduction in price fixed by the contracting officer was accepted by Eich August 25,1952.
15. Thirty-six of the 37 lots of eggs offered under the contracts of Sol Eich & Company for delivery at Peoria Septem *390 ber 2, 1952, failed to meet the quality requirements specified in PY-61 and were rejected. The additional work of re-candling, and replacing a large portion, of the eggs in each lot delayed the deliveries beyond the specified delivery dates. Upon requests of Rich, the PMA extended the prospective September 2 deliveries for a period of ten days at a reduction of one-fifth of a cent a dozen a day and two-fifths of a cent a dozen for deliveries after September 12.
On September 17, 1952, Rich wrote the contracting officer that it would be in default on the September deliveries of two lots under contract 2691, five lots under contract 2695, and three lots under contract 2732. These ten lots were accordingly terminated by the contracting officer September 18, 1952. Plowever, by letter of October 24, 1952, the contracting officer withdrew the termination of these lots and extended the time for all delinquent deliveries until November 7, with a net reduction of two cents a dozen on all deliveries that were delayed for ten days or more. One lot under contract 2695 was extended for delivery until November 12, 1952, at the flat reduction of two cents a dozen. Thus, as in the contracts with Nichols & Company, the maximum reduction for delayed deliveries of ten days or more was limited to two cents a dozen on all of the Rich contracts.
16. The plaintiff’s contracts 2727 and 2738 called for the delivery of 54 lots of 27,000 (30 dozen cases) and the Rich contracts 2691, 2695, and 2732 called for the delivery of 6tt lots of 31,200 30-dozen cases. The plaintiff actually delivered 118 lots of 57,040 30-dozen cases under all of these contracts, because most of the lots delivered at Peoria, Illinois, and Burlington, Iowa, consisted of 480 30-dozen cases. The plaintiff performed all of the contracts in full, insofar as they pertained to the plaintiff’s eggs, and made final delivery on or about November 12,1952.
The following summary contains the contract price, contract adjustments, and the net payments under each group of contracts in accordance with the delivery points required:

*391

17. Plaintiff claims breach, of the contracts involved in this action, particularly at Peoria, Illinois, by inspectors Thomas S. McCurley and Kobert L. Young, who performed most of the inspection of eggs offered for delivery at Peoria. Plaintiff contends there was bias and unfair grading of its eggs, improper selection of samples for grading, refusal by de *392 fendant to perform regrading of rejected lots when requested to do so, excessive and rough handling of eggs, and the use of a candling light with excessively intensive light power which resulted in reporting of excessive defects in the eggs examined and improper classification of the eggs, all of which plaintiff alleges were contrary to the contract specifications and administrative regulations for the inspection and grading of shell eggs.
18. Regulations were issued from time to time by PMA for the grading, labeling, and classification of shell eggs and poultry products. The regulations governing the inspection and grading of shell eggs during the delivery periods of the contracts herein were consolidated and issued in July 1952 as the Shell Egg Graders Handbook, a copy of which was placed in evidence as plaintiff Exhibit No. 6.
Shell eggs were classified into approximately 15 U.S. Grades, as U.S. Grade AA (Consumer), U.S. Specials, U.S. Grade A, Procurement I, Procurement II, Procurement III, Procurement IY, U.S. Extras, U.S. Grade B (Consumer), U.S. Standards, U.S. Grade C (Consumer), U.S. Stained,' U.S. Trades, U.S. Dirties, and U.S. Checks. When any lot contained more than 5 percent “loss,” it was certified as “No U.S. Grade.” The specifications in PY-61 for weight, grade, and loss allowances came under Procurement II grade. The tolerance for individual cases inspected was 10 percent less than the lot average requirement.
The term “stained” was to be employed where the soiled portion was not more than one-eighth of the shell area; “dirties,” where more than one-eighth of the shell area was soiled; “checks,” if the shell was cracked but the membrane was not broken; and “leakers,” if membrane was broken to the extent that it permits leakage of the egg. Except on a request of an applicant it was not required that “stained” eggs be graded as to interior quality, other than for loss and checks.
19. The regulations permitted a wide latitude for the discretion and judgment of the grader, and the proper grading of the shell eggs depended largely upon the training and experience of the grader. However, certain provisions, tol *393 erances, and allowances were specified and required in the inspection and grading of shell eggs.
The Shell Egg Graders Handbook, which was regularly employed by graders, provides, in part, as follows:
I. Requiked Facilities
B. Candling light
1. There are many different styles and types of candling lights commercially available in which the light intensity and the size of the candler opening vary considerably. Most of these candling lights, however, are satisfactory, if they are adjusted to provide comfort and proper illumination for the job. It is merely a matter of becoming accustomed to the type of light in use. Accuracy of the candling results can be checked by breaking out a few eggs and checking the broken out quality with the candled results.
The regulations providing standards for quality of individual shell eggs include, inter alia, the following:
§ 42.1 Application. * * *
Interior egg quality specifications for these standards are based on the use of a candling light delivering approximately 350 to 450 foot-candles of light at the candling opening. The usual box type of candling light, without reflector, using a clean 40-watt frosted bulb about l~y2 inches from and in direct line (direct light) behind the opening which should be approximately 1 ~y8 inches in diameter, or a clean 60-watt frosted bulb immediately above and 1 ~y2 inches behind the opening (indirect light) provides approximately 310 foot-candles of light at the opening. A 60-watt bulb in a direct light candler, or a 75-watt bulb in an indirect light candler, provides approximately 380 foot-candles of light at the opening. Reference to “usual box type of candling light” should not be construed as restricting use to that type only. Any type or make of candling light may be used so long as the resulting foot-candles of fight are the same.
The Shell Egg Graders Handbook provides at paragraph V, “THE DRAWING OF SAMPLE,” in part as follows:
A. Graders are to personally draw all samples, including, if possible, samples from lots in a public ware *394 house. When sample is drawn by a public warehouse employee, the covering certificate shall be qualified with the words typed in all capital letters WAREHOUSE SAMPLE.
B. * * * Draw the samples proportionately from various parts of the lot.
if: # :fc #
G. Regrading — Appeal Grading
Whenever an applicant questions the correctness of the original grade and size, a regrading may be made by re-examining the original sample and in addition draw a duplicate size sample at random. The final grade shall be the average of the original sample (second grading) and the duplicate sample. The fee for such grading shall be based on time. The date on the certificate shall be the date of the final grading. Such a regrade may be made only after the original certificate is surrendered.
An applicant may also file a request for an appeal grading. Whenever such an appeal is allowed, the grading procedure shall be the same as for a regrading.
An appeal grading could be made by any interested party who was dissatisfied with the grading certificate within 2 days after it was issued, orally or in writing, whereas a request for regrading could be made at any time by such interested party. The pertinent provisions of the regulations dealing with appeal grading are set out in 1 C.E.R., Part 55, as follows:
§ 55.22 When appeal grading may he requested. An application for an appeal grading may be made by any interested party who is dissatisfied with any determination stated in any grading certificate; if the identity of the samples, or the product, has not been lost; and such application for an appeal grading shall be made within two days following the day on which the grading was performed. Upon approval by the Administrator, the time within which an application for an appeal grading may be made may be extended.
§ 55.23 How to obtain appeal grading. Appeal grading may be obtained by filing a request therefor (a) with the Administrator, (b) with the grader or inspector who issued the grading certificate with respect to which the appeal grading is requested, (c) with the immediate superior of such grader or inspector, or (d) with the officer in charge of any office of grading. The applica *395 tion for appeal grading shall state the reasons therefor and may be accompanied by a copy of the aforesaid grading certificate or any other information the applicant may have secured regarding the product, at the time of grading, from which tb.8 appeal is requested. Such application may be made orally (in person or by telephone), in writing, or by telegraph. If made orally, written confirmation may be required.
* * * *
§ 55.28 Who shall make appeal gradings. An appeal grading of any graded product shall be made by any grader (other than the one from whose grading the appeal is made) designated for this purpose by the Administrator; and, whenever practical, such appeal grading shall be conducted jointly by two such graders.
20. The number of samples inspected for the purpose of grading a lot depended upon the size of the lot offered. In carlots of 401 to 600 cases, the minimum samples required to be inspected were 15 cases of 30 dozen each. But, if in doubt, or if the quality of a lot was irregular and the grade not clearly defined, it was necessary to examine as many as 30 or more cases.
The grading of samples required the examination of 100 eggs in each case of 360 eggs, and the average grade for the lot was based upon the number of sample cases multiplied by 100. Thus, a minimum of 1,500 eggs were inspected for the determination of the average grades of each lot of 500 cases of 180,000 eggs, representing less than 1 percent (.83 percent) of the lot graded. Further, the “loss” allowance of .3 percent under PY-61 permitted a maximum of four or five eggs, of combined dirties, leakers, and other eggs constituting “loss” out of the total of 1,500 eggs inspected.
The quality of a lot was determined upon the basis of the total number of samples selected. It was an applicant’s privilege to rework the lot, by removing the eggs candled by certain candlers, by individual case inspection, by recan-dling, or by eliminating portions of the lot. But, when the character of the lot was changed in this manner, it was required that new samples be selected and the grades certified as a new lot. The original certificate was never to be destroyed.
*396 21. The method of grading required that the 100 eggs inspected in the first sample case be taken from the top three fillers of 36 eggs each on one end of the case, except eight eggs in the lower filler. The second sample case required the examination of the second, third, and fourth fillers; the third sample required the examination of the third, fourth, and fifth fillers; the fourth sample required the examination of the first, second, and fifth fillers; and the fifth sample required the examination of the first, fourth, and fifth fillers, all from one end of the case and excluding eight eggs in the lower filler in each instance. The same procedure was to be followed in the examination of samples in excess of five for the same lot.
The eight eggs in the lower filler of each case examined were to be left in the same corner in each case in order to avoid any argument as to whether any of the eight eggs left in the third filler were to be included or excluded in grading the case.
The 100 eggs examined in each case were then to be replaced on the top fillers of one end of the case, and that end was to be stamped twice to identify the end examined. The entire lot was then identified by the official grade stamp.
22. In the grading process each half case graded was to be examined for the presence of any undesirable odors, and, if found, the lot was placed in a “No U.S. Grade” classification. All eggs appearing dirty when the filler was removed were to be candled first.
A memorandum, sometimes referred to as a work sheet, was required for the recording of all details upon which a grade was determined. In connection with its preparation, the Shell Egg graders Handbook states, in part, as follows:
XI. PREPARATION OP MEMORANDUM
A. Execute the official egg grader’s memorandum in detail at the time of grading. All grading certificates shall be “backed up” with a detailed memorandum which shall be kept on file. Sign the memorandum in ink or indelible pencil.
B. The detail required on the memorandum includes all information that is typed on the certificate and in addition such comments as to loading, holding, and gen *397 eral character of the eggs as may be useful, should there be a dispute as to the accuracy of the grade at a later date.
The final grading was prepared in certificate form, showing the classification of each case sample, and the average grade of all samples, which became the grade of the lot. The number of copies of certificates depended upon the request of the applicant for whom the original, and as many copies as desired, were to be furnished. One copy with the official memorandum attached was to be forwarded each Saturday to the State Supervisor’s office. One copy was attached to the monthly report to the State Supervisor’s office, and an extra copy was prepared when the applicant was a Federal agency.
Upon request of an applicant, advance information could be furnished in respect to all or part of any grading certificate issued to him or to any person designated by him.
23. Prior to the dates that bids were submitted for the delivery of eggs under PY-61 by Nichols and Kich, the plaintiff had in storage 89 lots of eggs in approved warehouses in Peoria, Illinois, and 28 lots of eggs in Burlington, Iowa. All of these eggs had been inspected and graded and certificates were issued at the time they were placed in storage. Certificates covering 59 lots of eggs in warehouses in Peoria were introduced in evidence. Most of these lots of eggs were graded as “extra large,” and, with the exception of one lot which was graded 68.9 percent, each lot was graded 70 percent or better of “A” quality. However, the “loss” classification in excess of .3 percent and up to a maximum of .8 percent appeared in the certificates for 27 lots at Peoria and four lots at Burlington, with additional loss by reason of dirties and leakers in excess of .3 percent in four lots at Peoria and five lots at Burlington. Thus there were 40 of the 59 lots for which certificates had been issued when the eggs were placed in storage containing “loss” in excess of the .3 percent specified under PY-61.
24. Prior to the time for the first offering of eggs under the contracts, and commencing about the end of July 1952, plaintiff had portions of each lot removed from the warehouses and recandled. Undesirable eggs were removed and replaced before returning them to storage and before *398 they were offered for final inspection. Those stored at Peoria, Illinois, were hauled to plaintiff’s plant at Avon in refrigerator trucks, a distance of approximately 55 miles, where the recandling was performed by plaintiff’s employees. Approximately 3,000 cases of eggs out of about 40,000 cases were reworked in this manner. From five cases to approximately 150 cases in each lot were reworked in order to improve the grade average so that the lot would meet the contract requirements. All cases of eggs that were recandled and inspected were marked for identification with a small strip of scotch tape.
25. Prior to the inspection of any of the eggs tendered for delivery, Thomas McCurley told Mr. Nichols that he was of the opinion that storage eggs could not meet the requirements of PY-61 without complete reworking. This opinion was shared by at least three other officials of the USDA, all of whom so testified at the trial of this case.
At about this same time McCurley also told Nichols that he was considering going into the retail poultry and egg business in Springfield, and asked Mr. Nichols, in case he decided to do so, if he would furnish him poultry and eggs on credit, but Mr. Nichols told him that he conducted his business on a cash basis and could not do so.
26. By letter dated August 20,1952, to Thomas McCurley, the plaintiff submitted for inspection at Peoria 20 lots of eggs on its contract 2727 and twenty lots on the Bich contract 2732. These lots were offered for delivery to PMA on September 2,1952, together with seven lots under Bich contracts 2691 and 2695 on which deliveries were transferred from St. Louis to Peoria. When plaintiff offered eggs under the Bich contracts, McCurley made inquiry as to plaintiff’s interest in the Bich contracts, and was informed by M. L. Nichols, Sr., president of the plaintiff corporation, that it was under a financial arrangement, but he did not advise McCurley that Bich was his broker.
Of the 47 lots tendered at Peoria for delivery September 2,1952, only 11 lots were accepted under Bich contract 2732 and all other lots were rejected for failure to meet the requirements of PY-61. Thereafter the plaintiff was required *399 to rework substantially all eggs offered under PY-61, as hereinafter reported.
Of the 30 lots tendered at Peoria for delivery October 1, 1952, on contracts 2727 and 2732, only ten lots were accepted without penalty. The plaintiff offered and paid for inspection of 165 lots of eggs at Peoria before the acceptance of 77 lots under contracts involved herein.
Approximately 111 lots of eggs were reworked completely one or more times.
27. On August 20,1952, plaintiff submitted for inspection eight lots of eggs at Burlington, Iowa. Seven of these lots met the requirements for weight and quality of PY-61 and were delivered under contract 2738 on September 2d, and one lot was reworked and accepted on September 9, 1952. Eight additional lots were offered for inspection September 19,1952, of which five lots were accepted for delivery October 1st. Of the three lots rejected, two lots were reworked and accepted October 3d and one lot was accepted October 9, 1952. All eight lots offered for inspection and delivery November 1, 1952, were accepted on contract 2738.
28. Plaintiff had no eggs in storage at Memphis but transferred nine lots from Peoria and three lots from Burlington to an approved warehouse there for delivery under Rich contracts 2691 and 2695. The inspection certificates issued at the túne these lots were placed in storage show “loss” in excess of .3 percent on seven of these lots. They were partially reworked before they were offered for delivery. None of these lots was rejected. Seven lots were accepted for delivery September 1st, and five lots on October 1, 1952.
The plaintiff offered five lots of eggs at St. Louis for delivery October 1, 1952, under Rich contract 2695, of which one lot was rejected and replaced.
29. Pursuant to plaintiff’s request for the inspection of eggs it proposed to deliver under the contracts herein, inspectors Thomas S. McCurley and Robert L. Young commenced inspection of these eggs at the Peoria warehouse about August 25, 1952. . The first few lots were found of very high quality; it was found that, some of the sample cases were marked with a strip of scotch tape, indicating that they had been reworked. It is established that when *400 warehouse employees select the samples for an inspector they are likely to take them from the most accessible places and also replace the reworked eggs in the most accessible portion of the lot from which the samples for a final inspection would normally be taken. In one instance five additional sample cases were drawn by inspector McCurley, whereby an excess loss was established for the lot and four additional lots were rejected by amendments.
The inspectors at Peoria stated that the samples inspected during the first two days were drawn by warehouse employees, but the certificates issued for these first lots do not indicate who drew the samples, as required by the regulations. In Burlington, Iowa, where warehouse employees drew samples during the first few days, it is so indicated on the certificates issued. Except for the first two days of inspection, all samples at Peoria were selected and designated by the inspectors.
Inspectors McCurley and Young graded most of the eggs offered by plaintiff at Peoria, but they were later assisted by inspector James S. Crosson, and, during the first week, William H. Dingman assisted in the inspection and signed certificates for 17 lots, of which 14 lots failed to meet the requirements of PY-61. By August 30, 1952, samples from 49 lots had been inspected and 38 of these lots failed to meet requirements.
The plaintiff had no representative at Peoria where the inspection was being performed until late August or the first of September 1952, when Mr. Harold Altheide, the plant manager, arrived at Peoria to take over the rejected lots of eggs and offer other eggs on the contract. The rejected lots of eggs were reworked as rapidly as possible at Avon and Bushnell, Illinois, so that they could be offered as new lots and reduce the delay in making deliveries. When most of the reworked eggs were again rejected Altheide declined to offer other eggs, and on September 26th requested Nichols to relieve him of duty at Peoria. Mr. Merlin Nichols, Jr., came to Peoria about October 1, 1952, and supervised the reworking of eggs and offers of eggs under the contracts until completion.
*401 30. Small cold storage warehouses do not normally provide space for reworking stored eggs, but furnish only one small room for the inspectors. During the period from September 1 to 12, 1952, the plaintiff hauled some 27 complete lots to Avon and Buslmell, Illinois, for reworking. The plaintiff had employed additional graders and maintained approximately 20 to 24 graders in reworking eggs rejected at Peoria. Because of the urgency to make early delivery and reduce the penalty for delays, the plaintiff reworked 23 lots entirely, and returned four of the lots and redistributed them with four other lots.
During the period from September 4, when inspection was resumed, until September 15,1952, the inspectors examined 24 additional lots, most of which had been reworked completely. Only 7 lots of these met contract requirements and 17 lots were rejected.
Inspections were made and certificates issued on eight lots the same day they were returned to the warehouse, three other lots on the first day in storage, four on the second day, two on the third day, five on the fourth day, and two on the fifth day. The lots that were reworked at Avon and Bushnell were not usually stored in the warehouse cooler until after inspection to determine whether or not they would be accepted.
It was the duty of warehousemen to store all perishables as soon as received. Because of the procedure of inspecting these lots before placing them in storage, some of the eggs remained on the loading docks for several hours and the weather was very warm; the average temperatures for the month of August being from 62.2° F. low to 83° high, and for September a minimum of 52.7° and a maximum of 78.7°.
Some of the samples were returned to the warehouse the same day they were inspected. Samples marked for inspection would be placed on dollies or platforms and shifted from place to place in congested areas until they could be inspected. This was necessary because they could not be returned to the warehouse until they had been inspected and accepted.
The stenciling of all cases in a lot which was approved for delivery on PY-61 contracts was omitted in the early lots until they were loaded out in order to avoid excessive han- *402 filing- However, McCurley required that all of these lots be stenciled before a certificate of inspection would be issued, and that all lots offered under PY-61 contracts thereafter be marked and stenciled before inspection, which resulted in additional handling.
Certificates of inspection were normally issued the same day that eggs were graded, and the applicant, plaintiff in this case, would normally have received the same within two or three days, except for some delay in stenciling the early lots inspected.
Thereafter, arrangements were made whereby all of the eggs remaining for delivery were reworked in the hallways of the warehouse. Eegular inspection was again resumed about September 23,1952, and continued until about November 8,1952. All of the eggs offered during this period were reworked in the Peoria warehouse and 52 lots were accepted out of 82 lots inspected.
31. No regular inspection was performed at Peoria between August 30 and September 4, 1952, after only 11 lots were accepted out of 47 due for delivery on September 2, 1952. Nichols offered other lots, which he had on storage in Peoria for intended delivery October 1st, but McCurley stated it was useless to inspect any additional lots for delivery under the lunch program of PY-61 until they had been completely reworked. Dolson stated that his instructions to McCurley were to continue to grade lots offered, and that the reworking of a lot of eggs was not a condition to complying with a request for inspection. However, it was McCurley’s opinion and he so advised Nichols, that eggs which were inspected in the spring when stored, having a loss factor of .3 up to .7 percent, could not be expected to pass inspection for acceptance under PY-61 with a maximum loss allowance of .3 percent because of some deterioration which would occur while in storage and from handling.
No regular inspection was performed at Peoria from September 15th, when the reworking of eggs was discontinued at Avon and Bushnell, and September 23,1952, when plaintiff established graders to rework eggs in the Peoria warehouse.
32. About two days after inspection of eggs was commenced in Peoria on August 25, 1952, Lawrence J. Dolson, *403 the Chicago area supervisor, was informed by McCurley that Nichols had protested the rejections being made by the inspectors and had requested reinspections of the same lots. Dolson advised McCurley that regrading was not permitted unless the lot had been reworked, or the character had been materially changed, so as to constitute a new lot of eggs. The plaintiff made repeated requests for the regrading of lots previously rejected, but requested that the regrading be performed by inspectors other than McCurley or Young.
In one instance McCurley had assembled a group of “loss” eggs that caused the rejection of the lot, and Mr. Altheide requested that the eggs be broken out of the shell to determine the condition of the contents. They were broken in the presence of three inspectors and every egg in the group was found satisfactory and the grading was amended for acceptance of the lot.
Plaintiff made no request for appeal grading.
33. As stated, a Mr. Dolson was the supervisor for the Chicago area, consisting of 12 States, including Illinois, but plaintiff, from the beginning, lodged his protests against what it considered unfair grading of its eggs with the PMA officials in Washington.
On September 14,1952, plaintiff wired Messrs. Termohlen, Flato, Kemper and Cunningham, in part, as follows:
We further request extension of time for delivery without penalty after September 12th because we believe Agency thru its agent and inspector in charge failed to have made inspections without prejudice. We further believe we could have made by this writing full delivery of all lots sold had we had inspection without prejudice in the normal course of business. We believe we have had much unnecessary and abnormal expense and costs in regrading of eggs which might have otherwise been acceptable had inspector in charge not been prejudiced. We believe the inspector to be of high integrity and sincere in his work but that he was at all times abritrary in his decisions regarding this particular contract and made the decisions as to the outcome of the grading prior to making inspections. Inspector informed us that eggs would not meet requirements of contract prior to grading, during original grading, during regrading and has informed us as of Sept. 13th that it would be impossible to pass further inspections because he had checked lots *404 previously inspected and found same to contain more loss than when originally inspected. That inspector in charge further informed us that agency should not have made contract which in his opinion was and is impossible to fill with storage eggs and also informed us we should not have sold eggs under a contract which in his opinion was impossible to fill. Inspector further informed us several times that he was not taking any responsibilities which might endanger his job and future and also that PMA should have taken steps to have this particular contract inspected by other inspectors. All we ask is that the agency allow us to fulfill this contract in the best possible time and manner under continuous supervision and inspection by inspectors appointed by Mr. Kempers who can make inspections without fear of personal harm and without prejudice to our fulfillment of our contract and obligation. Since Messrs. Termohlen, Miller, Flato, Cunningham and Kempers have promised us their wholehearted support and cooperation and that the agency has no intent of jeopardizing or causing the failure of our business and of putting our employees out of a job we hope the agency will give serious consideration to our request as outlined to Mr. Cunningham that beginning at once we be allowed to fulfill September contracts under continuous supervision and inspection while regrading the balance of contract by inspectors designated by Mr. Kempers either at Peoria or our plants without any additional penalties of time after September 12th as we could not financially absorb same. $ $ $ $ #
34. Upon the direction of Bernard W. Kempers, the Assistant Supervisor for the Chicago area, Dale H. Shearer, went to Peoria to receive and investigate Nichols’ complaints. He rechecked a number of the lots that had been rejected and found the samples substantially the same as they had been graded by the inspectors.
While in Peoria, Mr. Shearer explained to both Mr. Nichols and Mr. Altheide the reasons that the eggs were not meeting requirements, and reported that he received no specific complaint on any specific lots while he was there. The only specific complaint that he could recall was the first telephone call by Nichols to his office that the men were following the book too closely. Mr. Nichols did not complain to Mr. Shearer of any unfair grading.
*405 Prior to the installation of reworking operations in the Peoria warehouse, Mr. Shearer made personal inspections of two lots bearing new lot numbers and which obviously had been reworked at Avon or Bushnell. One certificate was issued by him on September 9, 1952, and met the requirements of PY-61. The other certificate issued September 16, 1952, failed to meet such requirements. On a later visit, on September 22 and 23, Mr. Shearer inspected five of the original lots, originally stored in the Peoria warehouse in February 1952, all of which had been reworked, and all these met contract requirements.
On October 10,1952, Mr. Shearer reported to Bernard W. Kempers that the gradings by McCurley, Young, and Cros-son were correct.
35. The plaintiff contends that one major reason for the downgrading of its eggs was the type of candling light employed by the inspectors. This type is known as the “BB” candler, containing a 60-watt clear bulb, with a reflector that would deliver a light estimated in excess of 4,000 foot-candles at three inches from the aperture. The “BB” candler had an aperture approximately 13/16th of an inch, with a rubber bumper, or gasket around the edge. Without the reflector the light intensity would measure about 300 foot-candles, and with adjustments of the reflector it would vary from 300 to in excess of 4,000 foot-candles. With the greater light intensity, certain defects in an egg became more pronounced and a wider range of flaws could be observed. It permits faster observation of the egg content and a more rapid inspection operation.
The “BB” candler has been used uniformly by the TJSDA inspection service since 1952. However, this was the first use of the “BB” candler in plaintiff’s experience. There is no evidence that any of the graders at Peoria had any prior experience in the use of the “BB” candler, except William H. Dingman, who used it in some field work in Korea in 1950.
The merits of the “BB” candler are established by its adoption and use as the standard type in all major warehouses. The downgrading of plaintiff’s eggs, if any, which resulted from the use of the “BB” candler, is not determinable from the evidence presented.
*406 36. The plaintiff had a number of conferences with PMA officials in connection with the grading' and reworking of eggs and to arrange extensions of time for deliveries. At conferences in Washington on September 12 and 15,1952, Nichols submitted his complaints of unfair grading and requested an investigation. The matter was discussed with Messrs. Kempers, Termohlen, Miller, Flato, and Cunningham.
Mr. Miller stated that it was not contemplated that eggs offered under PY-61 would be reworked, but that the bid price should have provided for necessary reworking to meet the quality and loss requirements and that most of the eggs offered were reworked. Both Mr. Kemper and Mr. Ter-mohlen were of the opinion that plaintiff should have known that storage eggs would have required reworking to meet the requirements of PY-61. These officials offered to cooperate and did assist in the arrangement for the reworking of eggs in the Peoria warehouse, in order that plaintiff might avoid hauling them to Avon and Bushnell and the excessive handling.
A report of deliveries under PY-61 in Nebraska was made by the state supervisor, pointing out that, of 116 original lots offered, 50 lots had not been reworked and 28 of them were accepted and 22 were rejected; 66 lots had been reworked, and, of these, 54 lots were accepted and 12 rejected. A total of 118 lots were finally accepted in Nebraska by replacement of certain lots and the reworking of other lots. There is no evidence to show to what extent the original lots were reworked. Some of the lots offered had never been inspected when they were placed in storage. Sol Rich & Company was contractor for 46 of the lots delivered in Nebraska.
No documentary data relating to the experience of other contractors under PY-61 have been put in the record in this case.
37. On January 18,1953, the plaintiff submitted a claim to the Comptroller General for $177,136.27, based upon unfair and improper grading of eggs delivered under PY-61, primarily at Peoria, Illinois. The claim as filed is a part of plaintiff’s proof in the record of this suit.
*407 By letter of June 29, 1953, True D. Morse, Under Secretary of Agriculture, submitted to the Comptroller General a memorandum by William D. Termohlen, dated May 28, 1953, together with copies of two investigative reports, and recommended that plaintiff’s claim be denied in its entirety.
There is no evidence of record to show what action, if any, was taken by the Comptroller General’s office with respect to plaintiff’s claim.
38. The reason assigned for rejection of most of the eggs offered by plaintiff was a loss factor in excess of the .3 percent maximum allowance. Good eggs do not deteriorate very much while in storage, but poorer quality eggs continue to deteriorate. The hauling and repeated handling of the eggs in the reworking procedures and inspections contributed to the deterioration and loss factor in plaintiff’s eggs.
The eggs offered for delivery at Memphis were reworked only in part, and were all inspected at Avon, Illinois, for quality under PY-61 before they were transferred to Memphis. However, upon final inspection at Memphis, nine out of the twelve lots contained checks or losses in excess of maximum allowances, but were accepted with a small penalty reduction in price because of the additional tolerances for transit damages permitted under Article II of PY-61, where the eggs had been inspected within 15 days prior to final inspection and delivery and were found to have been within the maximum tolerances.
The lots transferred to Memphis were first inspected at Avon by Harry J. Brown and upon delivery to the Memphis warehouse were inspected by W. A. Covington.
39. The plaintiff furnished 57,040 cases of eggs or approximately 11.4 percent of the 500,000 cases of authorized purchases under PY-61. Except for the comparison of grading and rejections at Peoria with certificates issued for plaintiff’s deliveries at Burlington, St. Louis, and Memphis, there is no evidence that plaintiff attempted to obtain the certificates and compare grades on deliveries under PY-61 by other contractors.
In order to show irregularities and unfair downgrading of its eggs at Peoria, the plaintiff requested and received *408 copies of certificates issued in the Chicago area for the spring and fall grading for the same lots of storage eggs during the years 1949 to 1952, inclusive. The plaintiff made a study and prepared analyses of the certificates for the same lots issued in the spring, when the eggs were stored, and in the fall, when the eggs were sold, as follows:

40. Under the rules of the Chicago Mercantile Exchange, penalties are imposed on a point basis by the reduction of a certain number of eggs in each lot measured by the graded percentage of quality below “par.” The plaintiff’s analyses for 1952 of certificates issued on the same lots of stored eggs in the spring and in the fall reflect a substantially greater penalty reduction in the spring certificates, when the eggs were first stored, with a corresponding penalty in the price received by the farmers and dealers who produced or acquired the eggs for storage. The fall certificates for the same lots show reductions in penalty eggs in 457 lots, an increase in 190 lots and no change in 144 lots. The net benefit to the fall owner, on the basis of 48 cents a dozen, amounted to $119,260.[3]
The defendant declined to verify or dispute these analyses. Mr. William D. Termohlen could not account for any increase in the absolute quality of stored eggs, but pointed out that a greater tolerance allowance is made in fall grading. Mr. Hermon I. Miller testified that an increase in the graded quality in the fall could be brought about by variations in the lots graded, since “warehouse samples” are normally used for fall inspections, and storage lots are generally accumulated from current receipts constituting small lots from different sources from which samples might be taken.
*409 On cross-examination Termohlen and Miller testified that so many variations between gradings made in the spring and those accomplished in the fall could not be attributed to human error.
41. The regulations for United States Standards, Grades, and Weight Classes for Shell Eggs, covering wholesale grades, issued July 1,1952, provide the tolerances for loss in each 30-dozen case of eight eggs, or 2.2 percent in U.S. Extras, A quality; and ten eggs, or 2.8 percent, in U.S. Standards, B quality, with the following provision:
§ 42.51 * * * (b) * * * For the period beginning on August 15 of any year and extending through January 31 of the next year, the permitted tolerance for Loss with respect to “refrigerator eggs” is 12 eggs (3.3 percent) [for U.S. Extras, A quality]
*****
(d) * * * For the period beginning on August 15 of any year and extending through January 31 of the next year, the permitted tolerance for Loss with respect to “refrigerator eggs” is 15 eggs (4.2 percent) [for U.S. Standards, B quality] * * *
There is no explanation in the regulations, nor in the graders’ handbook, for the increase of 50 percent “loss” tolerance allowance in fall grading. However, this increased loss tolerance applied to “wholesale grades” only, and did not apply to “consumer” or “procurement” egg grading.

Count V

42. During the period pertinent to claims herein, the plaintiff entered into various contracts and replacements thereof for grading and inspection services, all of which were executed on the printed forms provided by PMA. The agreements stipulated in the contracts were substantially the same. The contracts provided in part as follows:
It Is Agreed That:
(a) PMA will provide an adequate number of graders to perform the grading service covered hereby;
(b) At the sole discretion of PMA the graders may be either a Federal or State employee or a licensed employee of the applicant;
*410 (c) PMA shall not be responsible for damages accruing through any acts of commission or omission on the part of any grader;
(d) The provisions hereof shall continue in full force and effect from its effective date until suspended, withdrawn, or terminatedj by (i) mutual consent of the applicant and PMA; (li) written notice given by either party to the other to take effect on a specific date not less than 30 days from the date of the giving of such notice; (iii) one (1) day’s written notice by PMA to the applicant, if the applicant fails to honor any invoice within thirty (30) days after date of invoice covering the cost of the grading service as herein provided; or (iv) termination of the services requested herein pursuant to the provisions in the following paragraph (e);
(e) The services to be rendered hereunder shall be terminated by PMA at any time PMA, acting pursuant to any applicable laws, rules, or regulations, debars the applicant from receiving any further benefits of the service, or the services hereunder may be suspended or terminated at any time PMA concludes that the applicant has not conformed, or cannot conform hereto; * * *
The following contracts and replacement contracts were entered into between plaintiff and PMA, grouped in accordance with the type of service and the plant where services would be performed:

The plaintiff had four grading contracts which were in effect on April 1,1954. Each of these contracts specified that graders provided by PMA might be Federal or State employees or licensed employees of the plaintiff, but at the sole discretion of PMA. Licensed employees were required to furnish a bond to PMA, but could engage in any other activities of the operator, including supervisory duties, whereas *411 a grader wbo was a Federal employee was required to confine Ms activities to grading services and such closely-related activities as the PMA might approve, but could not in any instance assume the duties of management.
43. In addition to the several grading service contracts, a separate memorandum of agreement, dated April 1,1954, was prepared, signed, and submitted to plaintiff by L. J. Dolson and Thomas S. McCurley, for PMA, and was signed by M. L. Nichols for the plaintiff. This agreement was as follows:
In order to have a mutual agreement as to the conditions under which service is being furnished, we request your concurrence to the following items:
1. Mr. Schute will be the grader in charge and inspector of egg products in charge for all contracts in effect in your plants at Avon and Bushnell, Ill.
2. A bonded assistant will assist Mr. Schute at Bushnell.
'3. Mr. Schute’s headquarters will be Bushnell.
4. Mr. Schute’s normal hours of duty will be from 7 a.m. to 12 noon and from 1 p.m. to 4 p.m. Monday thru Friday. We do not expect him to work overtime except on official work. His annual and sick leave will be in accordance with the cooperative agreement between the U.S. Department of Agriculture and the Ill. State Department of Agri.
5. All official travel of Mr. Schute is by direction of his supervisor. It is understood that he may travel between Bushnell and Avon as directed by you. Such travel will be charged to you at the regular Federal rate and is payable to the Treasurer of the United States upon presentation of a proper billing by the Grading Service.
6. You are to furnish both graders adequate facilities. These are (but not necessarily limited to):
a. metal locker with lock.
b. individual egg scale with test weight.
c. scale for weighing 15 dozen eggs.
d. B. & B. candling light — this is the only light to be used in making official gradings.
e. thermometer for taking individual egg temperatures.
f. a satisfactory darkened inspection room to grade shell eggs.
7. Mr. Schute may only take technical direction from his Departmental supervisors. If you question his decisions, gradings, or inspection, you may appeal these in *412 accordance with the regulations of the Secretary of Agriculture part 55 and part 70, copies of which you have. Such appeals may be directed to Mr. McCuriey, Mr. Dolson, or the Washington Office of the Grading Service.
8. In accordance with your request, _Mr. Schute will make routine comments to the person in charge of the work assignment, however, major comments will be made to you or your Son.
9. When you begin grading at Avon, Mr. Schute will review the work of each candler with the thought of selecting a bonded assistant for that plant should the volume handled be such that you desire a bonded assistant for that plant.
44. The Federal Regulations governing licensed graders, inspectors, samplers, and supervisors of packaging eggs and egg products provide, in part, as follows:
§ 55.83 Who may he licensed, (a) Any person who is a Federal or State employee possessing proper qualifications as determined by an examination for competency and who is to perform service pursuant to this part may be licensed by the Secretary as a grader, inspector, sampler, or supervisor of packaging.
(b) Any prospective licensee other than a Federal or State employee possessing proper qualifications as determined by an examination for competency and who is to perform service pursuant to this part may be licensed by the Secretary as a grader, inspector, sampler, or supervisor of packaging. However, prior, to the granting of the license he shall procure and deliver to the Administration a surety bond issued by such surety as may be approved by the Administrator, in the amount of $1,000 for the proper performance of the duties of such licensee under this part.
There is nothing in the Federal regulations which required or authorized a licensed employee of the Federal or State government performing the same or similar duties to supervise the grading or inspection service performed by a licensed employee of the operator. There is nothing in these regulations which precludes licensed “bonded” graders from performing such check-grading and from issuing certificates of inspection or grades in the same manner as an NACC grader.
*413 However, as more fully reported in findings 45 through. 47, beginning in 1952, PMA announced a policy which would require the gradual replacement of licensed plant employees with Federal or State civil service employees. In the execution of this policy at least one Federal or State licensed grader was to be placed in each plant in a supervisory capacity initially. The civil service grader was to make all final check gradings and all grading certificates were to be signed by him.
45. The utilization of licensed company employees originated and their use was expanded during World War II. For several years the PMA had considered a policy which would result in the gradual replacement of licensed plant-employed personnel with licensed Federal or State civil service employees. This plan would avoid any increase in the number of licensed company employees, and replace those in firms having more than one service contract with PMA. This policy was set out in Instruction No. 918 (PY)-4, issued by the Director of the Poultry Branch of PMA on May 21, 1952, to all regional grading supervisors and Federal-State supervisors. It reads as follows:
EMPLOYMENT OK RESIDENT GRADERS WITH STATUS OE CIVIL SERVANTS
I. Purpose
This instruction is issued as a guide in carrying out established policies in the rendering of grading service with respect to poultry, eggs, and egg products through use of civil servant licenses on Federal or State Payroll.
II. Procedure
A. At least one grader, who has the status of a civil servant (State or Federal) will be stationed in any one plant for each operating shift, regardless of the number of types of grading service requested, except that additional personnel may be stationed at a plant when the regional supervisor deems it necessary to properly carry out the department’s responsibility. _ Alternate or assistant graders may be provided by licensing bonded employees. Final check gradings shall be made by the civil servant grader, and all certificates issued will be signed by him. However, bonded graders may perform final check grading, and issue and sign certificates in cases of emergency leave or sickness on the part of the civil servant employee.
*414 B. TLe foregoing procedure will be followed as expeditiously as possible with due consideration, to operating and administrative problems in connection with the recruitment and training of such individuals. As rapidly as such civil servant personnel becomes available, they shall replace bonded graders. Action should be taken immediately to effect this procedure in all cases where consumer grade labeling is being performed, and in plants where both inspection and grading services are in effect. In cases where product is identified only on the basis of institutional packs and where the services of sanitarians are required, the bonded grader and sanitarian shall be replaced as rapidly as possible.
C. Recognizing the personnel management problem where seasonal operations or small volume are involved, or where product is identified only on the basis of institutional packs, other than in eviscerating and drying plants, the continued employment of bonded graders will be considered on an individual plant basis. Prior to considering the continued use of bonded employees in seasonal or small plants, consideration shall be given to rendering service by a circuit grader or sanitarian.
D. Presently employed licensed bonded graders are an excellent source of supply for civil servant graders. Graders secured from this source should be transferred to plants other than those where they are presently employed. However, with approval of the Chief of the Inspection and Grading Division, a civil seryant grader may be stationed in the same plant where he has been employed under bond, provided his services as a bonded licensee have proven excellent in all respects.
46. On July 18, 1952, the PMA submitted a memorandum circular to all firms holding contracts for inspection and grading services, with a copy of Instruction No. 918, to clarify some misunderstandings and to explain the procedure in placing the policy in effect. It was explained that reasons for establishing this policy included (1) some objections on the part of the industry that licensed bonded company employees could not perform as unbiased a job as civil service employees; (2) complaints had been received from livestock sanitation officials, Public Health officials, ,and Food and Drug Administration officials who urged that the term “Government graded” by licensed graders other than Federal or State employees be discontinued; and (3) it would be in the public interest to proceed toward the elimination *415 of the use of bonded graders on as practical a basis as possible as soon as feasible.
The memorandum further stated that it was the policy of PMA to gradually replace plant-employed personnel licensed by PMA initially where the volume of operation was such that a full-time Federal or State employee could be clearly justified, particularly where consumer grade labeling was being performed and both inspection and grading services were in effect, as would apply to ready-to-cook poultry; where grading is done only on the basis of institutional packs and where the volume was found to be such that one Government employee could satisfactorily handle supervision of both grading and sanitation, giving due consideration to plant operating problems. Thereafter it was planned to continue the policy of replacements in consumer grade labeling of shell eggs, institutional pack grading of shell eggs, dress poultry grading institutional packs, plant sanitarians, and liquid and frozen egg inspectors. This was to be accomplished with due consideration given to seasonal operations or small volume on an individual plant basis. It was also stated that a very important consideration was to bring about this new policy with a minimum of inconvenience and with little or no additional cost to the industry.
47. The following comparison of graders for Illinois (other than Chicago), Indiana, and Iowa, plaintiff’s competitive area, is listed for firms receiving PMA “contract” grading and inspection services under the respective state supervising offices indicated:

*416 48. Following complaint from the plaintiff that the PMA graders were biased and prejudiced in grading eggs for delivery under the contracts now in suit at Peoria, Illinois, an investigation was made by the USD A with respect to its own employees who were involved, as well as the plaintiff. The investigation was performed by the Compliance and Investigation Division. The plaintiff’s records were examined, many of its employees were interrogated, and plaintiff’s former and current business associates at various places throughout the country were contacted during the course of the investigation.
Shortly thereafter, Mr. Nichols, Mr. Altheide, plaintiff’s plant manager at Peoria, Mr. McCurley, the Supervisor for the State of Illinois, and Mr. Dolson, the Supervisor for the 12-state area comprising Illinois, were discussing plaintiff’s complaints. They got into quite a heated argument, Nichols charging that he had not received fair and impartial inspection, and Dolson replying that Nichols was trying to pick his own inspectors, and was trying to tell the Government what to do, but he was not going to let him do it, that he was going to tell Nichols what to do, and that he had better learn then and there that he had to do it. Nichols said he was going to file a claim against the Government, and Dolson said that he was going to put Nichols out of business.
49. The plaintiff had contracts for continuous grading-services with PMA for shell egg grading at its Avon plant, for shell egg grading and egg products grading, and (from October 1952) for poultry inspection at its Bushnell plant, whereby PMA was required to furnish an adequate number of graders and inspectors, either Federal or State employees or licensed, bonded employees of the company, as reported in findings 42 and 43.
During the period from January 1952 until May 1955, Mrs. Anna Chambers was the licensed, bonded shell egg grader at plaintiff’s Bushnell plant. She also performed the egg products inspection and supervised the egg-breaking plant at Bushnell commencing in January or February 1953. Mrs. Zenna Bichter was the licensed bonded grader at plaintiff’s Avon plant during the period from January 1952 until about May 10, 1952, when she was replaced by Harry J. *417 Brown, an NACC grader, and sbe finally resigned in J anuary 1953. No other licensed, bonded grader was thereafter authorized in plaintiff’s plants, except for about 2 weeks in June 1953, when Evelyn Ogden served for a trial period and was dismissed.
50. About May 10, 1952, Harry J. Brown was assigned to plaintiff’s Avon plant and remained until about June 12, 1953. Others assigned to this plant included Julius W. Antoine, from July 7, 1953, until November 20, 1953; Bay Schute during April and May 1954; and Vitold Kilian from about June 1, 1954, until April 18, 1955, on which date he was replaced by John W. Schoonover.
Mrs. Chambers was a regular employee of Nichols & Company for approximately 20 years and the supervisor of the egg room. She was licensed as a shell egg grader about 1947 and a few years later was “bonded” as a PMA grader. She regularly issued PMA grading certificates, DA form 212, for approximately two years, until about January 1953. For a time thereafter, she was permitted to work under the supervision of the PMA inspector, but certificates showing the grade had to be signed by the PMA inspector.
51. The plaintiff’s egg-breaking plant at Bushnell was approved for the production of frozen egg products under USD A grade standards about January 16, 1953. On January 22, 1953, B. W. Kempers wired Dolson at Chicago as follows:
PMA POLICY BEQUIBES PLACEMENT OF NACC BASIS PBEVIOUS DIFFICULTIES AT NICHOLS, BUSHNELL, NECESSABY WE BEN-DEB SEBVICE BASIS NACC, THEEEFOBE UNABLE TO HONOB BEQUEST FOB LICENSE BY CHAMBEES UNTIL NACC STATIONED THAT POINT
All such service was temporarily suspended at Bushnell J anuary 24,1953, because PMA would not permit a “bonded” grader at this plant to issue certificates, and was unable to provide a Federal or State employee.
Plaintiff protested the suspension of grading service at the Bushnell plant on the ground that its competitors were having continuous operations under bonded graders and sug *418 gested to McCurley that Harry J. Brown, the NACC grader at Avon, be transferred to Bushnell. McCurley declined to transfer Brown to Bushnell because of his inexperience in grading egg products, but offered to employ Mrs. Chambers as an NACC grader and permit her to continue grading there. She was not employed by PMA, but later Mr. McCurley furnished her a letter of authorization to perform grading service in plaintiff’s egg-products plant. The suspension of Mrs. Chambers’ right to issue certificates did not interrupt plaintiff’s business.
On February 25, 1953, Mr. Dolson and Mr. McCurley visited plaintiff’s egg-breaking plant at Bushnell and found it did not meet compliance requirements with respect to several items. Plaintiff was requested to eliminate wooden racks from the breaking room, provide sufficient leaker trays to handle all leakers from the candling room, and provide an additional tank in the kitchen, as the plant had three wash tanks in the kitchen when approved and it was found that plaintiff was operating with only two tanks. Plaintiff was also advised that a further check would be made at the plant.
52. Mrs. Chambers supervised the egg-breaking production and graded eggs until her stamp and other Government papers were again taken up, about the end of April 1955, and all of plaintiff’s service contracts were terminated, as hereinafter reported. However, she was not permitted to issue complete USDA grading certificates recognized by the trade, but a type of certificate on the regular form DA-212, showing the volume of eggs graded, a specimen of which reads as follows:
2894 CASES U.S. EXTRAS GRADE A
ABOVE EGGS PACKED IN ACCORDANCE WITH OFFICIAL GRADING UNDER CONTINUOUS SUPERVISION, AND ARE COVERED BY WORK SHEETS ON FILE.
These certificates were summarized monthly and submitted to the PMA State supervisory office from which Nichols & Company was billed monthly in accordance with contract charges reported in finding 42.
*419 53. About May 10, 1952, Harry J. Brown was assigned to plaintiff’s Avon plant as NACC shell egg grader, and graded eggs at both the Avon and Bushnell plants. He also performed some of the grading of eggs for delivery under the plaintiff’s contracts at Peoria and Memphis. He was a USD A grader for many years, first licensed for poultry grading about 1933 or 1934, and as a shell egg grader about March 1952.
About February 20, 1953, Brown was charged by defendant with misplacing and mishandling of his official grading stamp and some months later was requested to resign and did resign from the service. On June 10, 1953, immediately after Brown resigned from PMA, he was employed by Nichols.
54. On November 26,1952, Harry J. Brown inspected and graded two lots of eggs for Nichols & Company at Avon, indicating on the said certificates that Weinberg Bros, of Chicago was the- buyer. Thereafter, on December 4 and 5, 1952, two grading certificates were issued by Lester R. Schrimsher at Laredo, Texas, bearing the same lot numbers carried in plaintiff’s Avon plant and the same number of cases in each respective lot, that show a large “loss” in the eggs. Comparisons follow:

The certificates issued by Schrimsher indicate that Julian Trevino was the applicant, Weinberg Bros, was the shipper or seller and the receiver or buyer “To be sold,” and that they were examined at the Cantu Fruit Co., Laredo, Texas. *420 These certificates were incorrectly prepared, in that they failed to show the warehouse lot number where they were examined, but reflect the same lot numbers under which they were examined at the Avon, Illinois, plant No. 625 of plaintiff.
Schrimsher was first employed October 27, 1952, as a trainee-grader at the PMA Des Moines office. He was transferred to the Dallas, Texas, office December 1, 1952. The certificates issued by Schrimsher on December 4 and 5,1952, were the first official grading certificates he had issued.
55. The two lots of eggs covered by certificates in the previous finding were returned to Chicago on December 15, 1952, but Weinberg Bros, was unable to sell the eggs of one lot and declined to pay Nichols for them.
When the eggs were reshipped to Chicago, and while still at Weinberg’s loading docks, Weinberg first had his inspector examine them and then telephoned Mr. Dolson of PMA to have an inspector examine them. Mr. Dolson came over himself and made an informal examination of a group of eggs from the lot and described them as “rotten.” No complete inspection was made and no official inspection report was made as a result of this examination.
Thereafter Nichols & Company brought suit against Weinberg Bros., in Civil Action No. 52-252-L, in the Circuit Court of Fulton County, Illinois, for recovery of the price of one lot of eggs for which Weinberg Bros, refused to pay.
In May 1954 Mr. Schrimsher’s deposition was taken in connection with plaintiff’s suit against Weinberg Bros., but he was not permitted by PMA to sign the same on the ground that his office in Dallas had not first received a copy of it.
56. On March 12, 1953, plaintiff was advised by Dolson that Harry J. Brown was not to grade any shell eggs until further notice, but that grading service would be provided from the PMA Chicago or Springfield offices without additional charges until Mr. Brown was advised that he would again be permitted to officially grade shell eggs at plaintiff’s plants.
After Brown had resigned on June 10,1953, no other Government-employed grader was available for assignment as *421 a resident grader at plaintiff’s plants, and plaintiff refused to pay for a temporary grader working out of Chicago.
The plaintiff’s contracts for PMA grading services in effect during 1953 provided for a charge equal to the salary costs paid to each grader assigned to the plant by PMA, including earned annual leave and sick leave when necessary. These contracts also provided, in part, as follows:
(iii) A charge of $25.00 for each additional grader or replacement of a previously assigned grader to the designated plant: Provided, That, no charge under this subdivision (iii) is to be made for temporary relief graders for regular graders or for the replacement of a grader who is a Federal employee when the replacement is made by PMA other than at the request of the applicant;
* * * * *
(vi) A charge for. the actual cost to PMA of any travel and per diem incurred by each grader assigned to the plant while in the performance of grading service rendered the applicant;
The plaintiff was satisfied with the services rendered by Harry J. Brown, and protested the suspension of his services by letter of March 13, 1953, to Dolson, which reads, in part:
The situation must be desperate for someone in regards to the action taken on Harry Brown. It is of no concern to me but being human it seems a terrible thing to see an honest man like him get thrown to the wolves to protect and cover other situations. The true facts are still a matter of record regardless of attempts to warp them and are available and will be made available at the opportune time.
*****
After all this fuss about Brown being in Bushnell etc. and my letter to McCurley which is still -unanswered (Jan. 24, 1953) I was indeed surprised when Mr. Crosson picked up Mrs. Anna Chambers stamps and papers. I suppose the next deal will be to pull the frozen egg inspection service. What is the reason that she is not being allowed to inspect shell eggs ?
After his resignation from PMA, Mr. Brown was employed by Nichols & Company, and has continued in plaintiff’s employ.
*422 57. About the end of January 1953, Mrs. Zenna Richter, a bonded, licensed grader at plaintiff’s Avon plant, resigned, and plaintiff immediately applied for another bonded grader as a replacement.
During the period from about March 12 to June 12, 1953, while Harry J. Brown was under suspension and until his resignation, the plaintiff was provided shell egg grading service by other PMA graders from Springfield at no additional cost to plaintiff, but no bonded grader was authorized.
A letter, by Howard H. Gordon, PMA Administrator, USDA, dated August 13, 1953, to Congressman Robert B. Chiperfield, states, in part:
In connection with Mr. Nichols’ complaint regarding delay in the installation of a shell _ egg grader at his Avon plant, we do not understand his concern. During the entire period referred to, from April 2, 1953, until June 10, 1953, when the installation was made, grading service was provided by fee graders from the State supervisor’s office with no additional charge to Mr. Nichols over and above that which would have been made with the licensing of the bonded grader, Miss Evelyn W. Ogden.
As to the reason for the delay, it so happens that a problem arose concerning some product which had been graded at Mr. Nichols’ Bushnell plant by a Government grader. The product was improperly graded and certified. As is customary in such cases, an investigation was conducted to determine the facts incident to such matter, including a determination as to whether plant management was in any way involved in influencing the improper action. We did not deem it desirable to proceed with the installation of the bonded plant employee as a licensed grader during the course of this investigation although, as indicated, service was rendered by State personnel.
Following the conclusion of the investigation and the determination that there was no evidence of improper action by the plant management in connection with the above-mentioned improper grading and certification, the bonded grader was installed on June 10 at the Avon plant. However, when this grader was checked on June 22, 1953, by Mr. Robert A. Dorsett with regard to her ability to grade eggs according to Federal standards, he found that she did not meet our standards of proficiency and her license was withdrawn. * * *
*423 There is no evidence which establishes that plaintiff was thereafter authorized to employ a “bonded” grader at its Avon plant. However, Mrs. Chambers, a “bonded” shell grader at Bushnell, was also licensed to inspect and issue certificates on egg products.
58. The next regular NACC grader assigned by PMA under plaintiff’s contracts was Julius W. Antoine. He was assigned July 6, 1953, as a poultry and egg grader. He had formerly worked for Swift & Company for some 28 years and as plant superintendent for about 11 years. He had served as an NACC grader for many years on poultry grading at the Swift & Company plant. He was reemployed by PMA and assigned to plaintiff’s Bushnell plant to grade eggs and to supervise the work performed by the bonded grader. He was the only qualified poultry grader assigned to plaintiff under its poultry grading contract, but plaintiff never operated its poultry-dressing plant under Government inspection.
Because of criticism of his work and the constant checking by PMA officials, Antoine resigned on November 20, 1953. He was considered for reemployment, but Mr. Dolson recommended against his assignment at Bushnell, stating, “I am not satisfied that Mr. Antoine did the best job he could at Bushnell.”
59. During the period from November 20, 1953, until Bay Schute was temporarily assigned to both of plaintiff’s plants as grader in charge and inspector in charge, about April 1, 1954 (see finding 43), plaintiff had no NACC grader assigned to service its four contracts with PMA. During this period Mrs. Amia G. Chambers was the o’nly bonded grader in plaintiff’s employ, and she was licensed to inspect egg products and to grade shell eggs, but was not permitted to issue shell egg grade certificates.
In November 1953 Mr. Dolson proposed to provide plaintiff grading service by an experienced man in the Chicago area. Plaintiff declined this service because of the higher costs involved, and suggested the names of nine residents of Bushnell who were both qualified and experienced and who would probably accept Government employment on the same terms as were made with Mr. Antoine.
*424 Again about December 29, 1953, Mr. Dolson proposed to transfer Yitold Kilian, an experienced NACO grader, from Sauk City, Wisconsin, to Bushnell, under terms which plaintiff agreed to accept about March 10,1954. Mr. Kilian was finally transferred and assigned to plaintiff’s Bushnell plant about June 1,1954.
60. Mr. Vitold Kilian was assigned to plaintiff’s Bushnell plant from June 1, 1954, until April 18, 1955. He was a licensed NACC grader for shell eggs, with one year’s prior experience at Sauk City, Wisconsin. He did not have a license to inspect frozen egg products, but McCurley, who was his immediate supervisor, gave him permission to do so. He graded shell eggs at both Avon and Bushnell, but never supervised the grading performed by Mrs. Chambers. There is no evidence of any complaints regarding inspection or grading services during the remainder of 1954. Kilian performed unofficial inspection on incoming eggs for Nichols and cooperated with plaintiff whenever time permitted and he was not engaged in official inspection and grading.
61. Early in 1955 the plaintiff organized the “Tri-State Poultry & Egg Dealers Cooperating Marketing Plan” sometimes referred to as the Randolph Plan, the latter being a similar organization which had successfully operated in Iowa. Under the plan plaintiff was to act as the sole marketing agent for all cooperating dealers, and all such dealers were expected to purchase supplies through the marketing agency. The plaintiff was to receive a stipulated fee per case of eggs for various specific services, including handling, refrigerating, assembling, and selling, also for hauling, processing, and strapping. All dealers would receive the market price for the eggs marketed. Some 39 dealers joined the plan, including 28 in western Illinois, ten in southeastern Iowa, and one in northwestern Missouri.
62. By circular letter dated March 18, 1955, to the cooperating dealers, the plaintiff announced that the marketing program would be commenced on Monday, March 28th. During the immediate period following the inauguration of the plan plaintiff marketed a substantial amount of eggs. Approximately 37,330 cases were handled from March 28th to May 13, 1955, having a value of approximately $411,000.
*425 63. On March 24, 1955, L. Ward Wagner received travel orders to review egg processing operations in Illinois, Indiana, and Missouri, and arrived at plaintiff’s Bushnell plant in the afternoon on April 4,1955, with Lloyd Fletcher and Thomas S, McCurley. They found approximately one-half a lot of eggs inspected and marked for delivery on an Army contract. They were outside the cooler in the warehouse area, stacked on dollies of about 20 cases to the dolly and packed tightly together. Wagner took the temperature of the cases and of invidual eggs in the cases, which reportedly registered from 66° to 70°. In taking the temperature of an egg the thermometer was inserted into the egg and the egg was held in his hand. Mr. Kilian had inspected that part of the lot in the morning and had gone to Avon to examine the other half of the lot, a distance of about 11 miles.
64. Upon arriving at Avon, Wagner inspected the worksheets and certificate prepared by Kilian for this lot of eggs. Kilian had recorded a temperature of 46° to 49° for the eggs when taken that morning. The Army contract called for the temperature of the eggs “when loaded.” The lot had been only partially loaded, and that part was at Avon. The Army contract required that temperatures of the eggs should be kept under 50° F.
Mr. Kilian was accused of incorrectly taking and recording the temperatures for these eggs, based on a conclusion that it would be impossible for the eggs to warm up 20° between the time Kilian took the temperature and the time Wagner took the temperature, with the cases packed tightly together with about 20 cases on each dolly. Kilian was required to telephone the Army receiving officer and to give the temperatures taken by Wagner for this lot of eggs. The eggs were rejected.
65. The half load, or lot, of eggs at Bushnell was inspected and graded by Kilian in the cooler and then moved into the storage area and the temperatures taken. Kilian denied that his temperatures were incorrect as taken and recorded, but conceded that his report was incorrect in that the Army contract for the eggs required the recording of temperatures only after they were loaded on the truck.
*426 The storage area where the eggs were left on dollies in the Bushnell plant was a brick structure with concrete floor, and unheated. Wagner testified that he found the room temperature to be 65° by a different thermometer at the time he checked the temperature of the eggs. The temperatures on April 4,1955, at the nearest point where climatological data were recorded (about 12 miles from Bushnell) were a maximum of 61° and a minimum of 45°.
66. Thereafter Kilian was transferred, effective April 18, 1955, to Illiopolis, Illinois, some 120 miles from Avon. When he was first assigned to Nichols’ plants in June of 1954, he was advised to make sure that USDA instructions were carried out, to be on the lookout for wrongdoing at the Nichols plants, and that the friction between Nichols and PMA officials was an unpleasant feature of the assignment there. During his assignment there, Nichols officials never argued with him over his inspection and grading determinations, and there was comparative harmony at the Nichols plants. Because of his previous good record, it was the determination of PMA officials that a transfer was for his own best interests.
67. Mr. John W. Schoonover arrived at plaintiff’s plants April 15, 1955, with Mr. Dolson and Mr. McCurley. He learned of the assignment only the day before. He went there as a shell egg grader only, but was to have the assistance of Mrs. Chambers, a bonded grader and egg products inspector. The record does not establish that Schoon-over had any experience with PMA inspection and grading service prior to the time he was assigned to plaintiff’s plants, but he was an experienced shell egg grader. He performed egg grading service for H. B. Christian from 1935 until 1943, when he went into military service. In 1946 he joined the inspection service of the Chicago Mercantile Exchange under Chief Inspector Herbert L. Hentschel, and continued there until the Government took over the inspection work of the exchange. Thereafter he was engaged in the egg business for himself in Chicago. His first official employment, according to his personnel record, initiated May 4,1955, on the recommendation of Mr. Dolson for his appointment as a poultry products grader instead of a shell egg *427 grader, unclassified. The appointment was approved by the personnel office at Chicago the same day, and finally cleared May 9, 1955. He has been engaged since that date as a poultry grader in the Chicago PMA office. He remained at plaintiff’s plants until May 3, 1955.
68. In April 1955 Nichols & Company was in the process of delivering eggs on large contracts for the Army, as well as other Federal and State agencies. Its plant was substantially filled with approximately 5,000 cases of eggs with more coming in daily. The cooler was filled with eggs stacked so closely that sample cases could not be marked for inspection in various parts of the lot until they were moved.
Schoonover personally marked all samples, and drew the samples himself until Mr. Dolson and Mr. McCurley left the plant. Thereafter he declined to handle the cases, and would not mark his samples until plaintiff’s employees broke down the stacks so that they could be marked. He inspected two lots for the Army jointly with Mr. Kilian, both of which were rejected. Schoonover participated in the grading of seven lots of eggs for delivery on Army contracts, of which he inspected two lots alone. All of these lots were rejected.
Nichols made an appeal on only one lot which was reinspected by Colonel Gould and Captain Bland of the Army Veterinary Corps, but they sustained the rejection of Schoonover.
One of Nichols’ associated dealers came to the plant insisting upon the reinspection in his presence of any of his eggs which caused the rejection of a lot going to the Army. Although Nichols authorized the inspection, Schoonover declined to make such an inspection, on the ground that many of the cases in the lot had been shipped out making it impossible to determine whose eggs had caused the lot to be rejected.
69. Despite the congestion of eggs in plaintiff’s plants, resulting largely from rejected contract eggs, Schoonover would do nothing other than candle eggs. He declined to move any cases of eggs in order to mark samples, and, on at least one occasion, sat in the plaintiff’s office, where other officials were engaged in their duties, the whole day, performing none of his own duties,
*428 Mr. Nichols asked him why he had picked up the shell egg stamp from Mrs. Chambers at Bushnell on April 27th, and was told it was done on orders from Mr. McCurley. On the evening of the same day Nichols called Schoonover into his office, repeated his statements made earlier, and told him to get out of his plant and to stay out.
Upon instructions from Dolson, Schoonover returned the next day to plaintiff’s plant, and was told by Altheide that it was Nichols’ instruction that he was not to make any more inspections. He again contacted Mr. Dolson at Chicago and, upon Dolson’s instructions, picked up all Government property at plaintiff’s plant and returned to Chicago on May 3, 1955.
70. On April 27, 1955, Schoonover requested the shell egg stamp and grading certificate forms from Mrs. Chambers and issued her a receipt for them. But, before releasing them, she telephoned McCurley. Mr. McCurley confirmed his instructions to her by memorandum on the same date, reading, in part, as follows:
This will confirm our telephone conversation of this a.m. whereby I instructed you to turn over to Mr. Schoonover the Shell Egg stamps and the Shell Egg Certificates that you have in your possession and for him to give you a receipt for the Shell Egg Certificate that have been assigned to you.
‡ ‡ $ H*
You are to keep in your possession the Frozen Egg Stamps and the processing and packaging certificates as you are the supervisor of Egg Breaking Operations. This same subject was written down on the 228 of which you read and signed when I was in the plant Tuesday p.m., April 26,1955.
Mrs. Chambers was instructed to assist Schoonover in shell egg grading at the Bushnell plant only if, in his opinion, he needed any grading assistance.
By telegram to PMA grading branch on April 30, 1955, plaintiff demanded the immediate reinstatement of shell egg grading service at its Bushnell plant in accordance with its contract. A reply was made by Mr. Hamann to plaintiff that grading service at Bushnell had not stopped but that service at both plants was rendered through civil servant *429 Schoonover, assisted at Bushnell by Mrs. Chambers, the same arrangement as agreed to April 1,1954, but that all requests for lot grading were to be made to Mr. Schoonover.
On May B, 1955, upon the termination of plaintiff’s contracts as hereinafter reported, Schoonover took over all remaining Government property held by Mrs. Chambers, and itemized it on the receipt under date of May 3, 1955. At the same time, Mr. Schoonover removed all official grading stamps and other Government property from plaintiff’s plants, on instructions from Mr. Dolson.
71. On May 2, 1955, plaintiff advised its associated dealers that eggs would be accepted during the remainder of that week, but that remittances could not be made until grading results were established, and that eggs would be accepted for the following week only for those who were unable to find other satisfactory outlets.
Nichols wrote them that plaintiff intended to dispose of its plants as soon as possible and suggested that the dealers establish their own grading service and marketing outlets.
72. On April 22,1955, plaintiff sent a telegram to Hermon Miller, Deputy Chief of Dairy and Poultry Inspection Service, PMA, requesting immediate replacement of Schoonover not later than April 25th, or a waiver of inspection serviceuntil satisfactory service could be installed, on the ground that Schoonover had broken the service contracts by refusal to grade the lots of eggs offered, worked overtime extensively without permission, spent an unreasonable amount of time making inspections, insisted that employees of plaintiff do his work, and generally disrupted the entire operation to such an extent that, unless immediate cooperation was received from the Department, it would undoubtedly be necessary to cease operations. Request was made for two additional graders by Monday, April 25th.
On April 25, 1955, L. W. Fletcher wired Nichols that an additional grader could be furnished Monday at $4 per hour plus expenses, requesting advice if not agreeable.
In his reply dated April 26th, Mr. Hamann advised plaintiff that investigation did not reveal that Schoonover had been negligent and that the Department considered his services satisfactory, but, in reviewing the workload, it might *430 be advisable to assign additional graders to plaintiff’s plants to properly handle the increased work resulting from its expanding program. This telegraphic reply further stated:
* * * If you wish to apply for cancellation without consideration to the 30 day clause we will consider your application on this basis.
73. On April 27, 1955, plaintiff wrote Mr. Hamann, Chief of the grading branch, PMA, in part, as follows:
* * * I realize as you also do that complete cancellation of your contract for USD A service will undoubtedly automatically cause us to cease operations. If for any reason you feel after finding out the true facts that cancellations of your contracts are in order we will accept your decision and close the business.
13. We are left no alternative from your telegram but to accept the present grader Mr. Schoonover or request cancellation; It is impossible for us to accept the present grader under the circumstances either physically, financially, or mentally and altho we would like to receive the service on the proper basis and do not wish same must request immediate cancellation unless given reconsideration by yourself or a superior. This is of course with waiver of the 30 day clause as the extra charges and loss now incurred are more than we can absorb.
In this letter Nichols reviewed the entire situation from the time Schoonover came to plaintiff’s plant. Finally he stated, “I am tired and feel that fighting government bureaucracy is an unsurmountable obstacle. Unless you reconsider and give us the cooperation and service we need and desire please cancel the service as soon as possible.”
By telegraphic night letter, dated April 29th, Mr. Hamann wrote plaintiff:
Reference your wire to Herman Miller April 22, 1955 your letter handled to L. Fletcher April 25 1955 and our wire to you April 26 1955 Please clarify your statements requesting waiver of service and discontinue our present business do you desire to cancel your contracts for grading service and request that we waive the 30 day cancellation clause please advise immediately.
74. An April 29, 1955, plaintiff wired Mr. Hamann of PMA as follows:
*431 Eetel yours 29th waiver not granted as per our telegraphed request and damage which could been avoided now done neither was request letter Fletcher granted and balance situation continuing meantime our dealers met and are desirous continuing business if possible please read our letter 27th and advise accordingly suggest you give serious consideration to reconsidering entire situation before making a decision and consider replacing present inspector with one from some country point that has had no contact personally or otherwise with Dolson or Chicago situations and one who is in a position to give fair and impartial gradings this is certainly not an unusual request and will definitely show that you are trying not only to cooperate but are willing to see we and our cooperating dealers get a fair break. For your information there are several people available in this area with experience to qualify them for not only shell eggs but frozen eggs. Several also available in Iowa.
A second telegram to Mr. Hamann on April 29,1955, read as follows:
Eetel add to previous wire this date stop note your wire states contracts plural when at issue is contract here and Schoonover be advised we wish to continue contracts Bushnell plant and same should be left alone unless you are deliberately attempting to void them.
The plaintiff’s contracts were cancelled by wire of May 3, 1955, by Henry G. F. Hamann as follows:
As requested in your letter of April 27,1955 and because of actions taken by you and Mr. Altheide on May 2 and 3 in barring Schoonover from your plant all contracts for grading services with the Agricultural Marketing service to be furnished at Avon and Bushnell are hereby cancelled, effective close of business May 3, 1955 the acceptance of your notice of cancellation of contracts does not affect your privilege of requesting non-contract grading under the regulations.
75. The plaintiff protested the cancellation of its grading and inspection contracts on May 4,1955, by telegram to Mr. Hamann as follows:
In reply to your telegram May 3rd cancelling contracts made no request for any cancellation. In our letter April 27th, 1955 we offered to accept your decision on questions after personal investigation by you here which *432 you did not make that offer now withdrawn did not bar Schoonover from plant and demand full and specific statement of facts on which you based that statement also demand full compliance with all grading contracts reserving all rights thereunder further demand full answer to all letters and telegrams past few weeks and continued services under existing contracts with your department.
Mr. Hamann replied to the above by telegram May 4,1955, as follows:
Reurtel May 4 my wire to you April 26 advised we did not consider Schoonover as having been negligent his performance of duties since you asked him to leave plant afternoon of May 2 and Altheide advised him May 3 that his services not wanted cancellation of your contracts effected in compliance request contained in item 13 page 6 your letter April 27.
76. Immediately after cancellation of its grading service and inspection contracts, the plaintiff began negotiations for the reinstatement of them. The defendant declined to reinstate the old contracts or to replace them. On June 15,1955, the Assistant General Counsel, USDA, submitted to plaintiff’s counsel a proposed new agreement, which reads as follows:
Upon consideration of your oral and written requests for the reinstitution of shell egg and egg products inspection services under contract in your plants at Avon and Bushnell, Illinois, it has been determined that the Department can provide such services. We understand that you do not desire the contract shell egg grading service to be activated immediately because of lack of such volume as would warrant this action. However, we understand that you wish the egg products inspection service activated under contract at this time.
Pursuant to your request the Department will initiate contract shell egg and egg products inspection service at the above-mentioned plants subject to the same terms and conditions provided for in your contracts for inspection service which were cancelled on May 3, 1955, provided that:
1. The provisions with respect to shell egg grading will remain inoperative until you notify us as to the exact date you wish contract service to commence. Your notification shall be in writing, allowing 15 days during *433 which time we will secure a Federal or State employee (NACC) grader to supervise all official grading services performed under these contracts. Pending assignment of such grader hereunder, you, of course, may request regular fee grading inspection with respect to shell eggs at these plants. You will not be required to pay any additional charge as a condition precedent to the assignment of such grader hereunder other than the inauguration charge referred to below.
2. With regard to egg products inspection, you will not be charged a survey charge in the absence of changes in your facilities since the cancellation of your previous contracts. However, you will be expected to pay the regular inauguration charge of $100 in advance of initiation of egg products inspection service. A company employee (Mrs. Chambers) will be licensed to supervise egg processing operations "under the contract; all product packed will be given a final inspection by an authorized Federal or State employee grader after freezing but prior to shipment, and you will reimburse the Department on the usual and published fee basis for these final inspections regardless of whether or not certificates are requested. You will, upon being billed, be expected to reimburse this Department for such fees and the proper administrative charges each month.
3. Final inspections hereunder shall be by or under the direct supervision of an authorized Federal or State employee grader and certificates shall be issued only by such graders.
The inauguration of service as herein provided shall be without prejudice to the rights or position of the Government or yourself with respect to any controversy relating to the cancellation of your previous contracts for shell egg and egg products inspection service.
If the foregoing is satisfactory and approved by you, your indicating your concurrence in the space provided below will constitute this as the contract under which inspection service will be rendered at your plants.
The plaintiff declined to enter into a new agreement for service.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes ás a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 Reworking consisted of the removal of “checks” and “dirties, leakers and loss” and any others In which defects were discovered by candling.

 An NACC grader was an employee either of the USBA or of a State.

 The comparison of certificates issued in the spring and in the fall was made by plaintiff.

 The above computations under these contracts are reported in lieu of plaintiff’s figures which do not represent actual contract delivery requirements, with the tolerance of 5 percent differentials in the number of cases in each lot. The figures are separated between plaintiff’s contracts and Rich’s contracts, since defendant contended at the trial that Nichols is not the proper party plaintiff in the Rich contracts. It also shows actual contract prices, penalties, and net amounts paid. Plaintiff claims recovery of the penalties in its Count I. Rich’s penalties (other than the transfer deduction of 2H cents a dozen for delays) is $7,075.60, or 46.62 percent of the delay penalties.